ESTATE OF HILTON W. GOODWYN, Deceased, STATE-PLANTERS BANK OF COMMERCE AND TRUSTS and HILTON W. GOODWYN, JR., Co-Executors, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Goodwyn v. Commissioner
Docket No. 480-67.
United States Tax Court
T.C. Memo 1973-153; 1973 Tax Ct. Memo LEXIS 132; 32 T.C.M. (CCH) 740; T.C.M. (RIA) 73153; July 16, 1973, Filed *132 The decedent established inter vivos trusts for various members of his family, reserving to the trustees broad powers of management and control with respect to both investments and distributions. Held: The de facto control excercised by the decedent as a result of the acquiescence of unrelated trustees was not a right to designate the persons who shall possess or enjoy the property or the income therefrom wtihin the meaning of sec. 2036(a) (2), I.R.C 1954. United States v. Byrum, 408 U.S. 125 (1972), followed. Held, further: Secs. 2033 and 2038 are not applicable. 2 The decedent's wife created an inter vivos trust within 3 years of decedent's death. Decedent managed and controlled said trust. Held: The unaccounted for increase in the corpus of the trust resulted from transfers made by decedent in comtemplation of death, and is therefore includable in decedent's gross estate under sec. 2035. The decedent transferred certain properties in trust within 3 years of the date of his death. Held: The transfers were gifts in contemplation of death, includable in decedent's gross estate pursuant to sec. 2035. The decedent purchased insurance policies on his own life and later transferred *133 ownership thereof to members of his family. Held: Certain policies are includable in decedent's gross estate by virtue of his retention of incidents of ownership therein within the meaning of sec. 2042. Others are not includable. Abraham Homer, John W. Pearsall, and John W. Pearsall, III, for the petitioners. Robert A. Bridges, Robert T. Hollohan, and John T. Flask, for the respondent. 3 QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: On or before October 27, 1963, a U.S. estate tax return was duly filed on behalf of decedent's estate showing a taxable estate in the amount of $748,534.91 and a net estate tax payable of $209,477.54. In his notice of deficiency, the respondent determined that the corrected taxable estate of the decedent amounted to $5,838,621.48, on account of which there was a deficiency in estate tax of $2,321,964.27. In explanation thereof, the respondent set forth the following: Adjustments to Taxable Estate
Taxable estate disclosed by return
$748,534.91
Increase in taxable estate:
(a) Sch. B - Capital stock
$23,000.00
(b) Sch. D - Insurance
80,969.89
(c) Sch. F - Insurance
28,354.69
(d) Sch. F - Federal income tax
1,260.00
(e) Sch. G - Inter vivos transfers
5,621,189.72
(f) Sch. N - Charitable bequests
24,810.00
5,779,584.30
Total
$6,528,119.21
Decreases in taxable estate:
(g) Sch. K - Debts of decedent
487,966.55
(h) Sch. M - Marital deduction
201,531.18
689,497.73
Corrected taxable estate
$5,838.621.48
*134 4 Explanations of Adjustments (a) The value of the capital stock of Richmond Shopping Center, Inc. has been determined to be $538,000.00 whereas a value of $515,000.00 was reported on the return, therefore, the gross estate has been increased accordingly. (b) It is held that the decedent possessed incidents of ownership in the following life insurance policies on his life: Northwestern Mutal Life Inc. Co., Policy No. 1998293
$61,469.89
Jefferson Standard Life Ins. Co., Policy No. 675441
8,000.00
Jefferson Standard Life Ins. Co., Policy No. 692372
3,500.00
Jefferson Standard Life Ins. Co., Policy No. 692371
3,500.00
Jefferson Standard Life Ins. Co., Policy No. 692373
3,500.00
Jefferson Standard Life Ins. Co., Policy No. 692374
1,000.00
Total increase to gross estate
$80,969.89 (c) It is held that the values of policy numbers 3015682 and 3015683, of the Northwestern Mutual Life Ins. Co., on the life of Hallie M. Goodwyn are $16,354.07 and $12,002.62 respectively, whereas each policy was reported at a value of $1.00. Gross estate has been increased by the amount of $28,354.69 ($16,354.07 plus $12,002.62 less $2.00). (d) Federal income tax refund, in the amount of $1,260.00 due decedent for the *135 year 1962 has been included in the gross estate. (e) The following items are included in the decedent's gross estate because of the interest retained in the properties by the decedent and the dominion, power, and control exercised by him over such properties: (1) Notes
$2,583,524.21
(2) Real estate
1,638,894.06
(3) Bonds
962,161.25
Accrued interest
3,655.91
(4) Cash
432,954.29
Total
$5,621,189.72 5 (1) Notes of the Goodwyn entities and of a principal amount of $3,444,698.95 have been included at a total fair market value of 75 percent. (2) Real estate of Goodwyn entities has been included at the total fair market value indicated above. (3) Municipal bonds of the Goodwyn entities have been included at the total fair market value, plus accrued interest, indicated above. (4) Cash held in the names of the indicated Goodwyn entities have been included in the following amounts: H. W. Goodwyn, fiduciary
$299,684.74
Goodwyn brothers
46,049.16
Hallie M. Goodwyn
22,283.03
Russell and Richards, trustees
56,850.38
Brunswick Aid Association
8,086.98
Total
$432,954.29
(f) Bequests to charitable organizations have been disallowed since debts of the estate will exhaust the probate estate, in addition the deduction claimed *136 in the amount of $12,810.00 as a bequest to Charitable status has not been established. (g) In view of the inclusions at (e) above, the following amounts are included as debts of the decedent: Goodwyn brothers:
State-Planters Bank of Commerce &
$35,000.00
Trusts
First & Merchants National Bank
283,023.49
First Mortgage Notes
104,242.76
Hicks Trust:
Anderson and Strudwick
57,978.30 6 From the outset, the petitioners contended that the notice of deficiency was insufficient, if not arbitrary and capricious. After hearing the evidence, it is the opinion of the Court that the responsibility for any inadequacy in the notice of deficiency must rest upon the petitioner. The decedent maintained a single set of books to record his personal transactions as well as those of various trusts created by the decedent or his spouse. Without any assistance from the decedent's representatives, and it clearly appears that none was forthcoming, it was not possible, as a practical matter, for the respondent to segregate the assests belonging to or under the control and management of the decedent at his death, as between the various trusts and other entities. The petitioner must bear full responsibility for the *137 failure of the decedent to keep separate records with respect to each of the trusts. Notwithstanding difficulties encountered by the respondent, some of the issues have been disposed of 7 by agreement of the parties. Those remaining in question are as follows: (1) Whether the assets of certain inter vivos trusts created by the decedent are includable in his gross estate under the provisions of sections 2033, 2036, or 2038. [1]
(2) Whether an unaccounted for increase in the corpus of an inter vivos trust created by the decedent's spouse may be included in decedent's gross estate as a gift in contemplation of death under the provisions of section 2035. (3) Whether certain assets transferred by the decendent by deed of gift on October 10, 1959, and December 15, 1960, are gifts in contemplation of death, includable in his gross estate under the provisions of section 2035. (4) Whether proceeds of certain insurance policies are includable in decedent's gross estate by virtue of his retention of incidents of ownership therein. 8 FINDINGS OF FACT Some of the facts have been stipulated. *138 The stipulation of facts and exhibits attached thereto, insofar as they have been determined to be admissible, are incorporated herein by this reference. Hilton W. Goodwyn, Sr. (hereinafter variously referred to as "decedent" or "Goodwyn") died on July 27, 1962, at the age of 84 years. He had been in ill health for at least 2 years prior to his death. He was survived by his widow, Hallie M. Goodwyn, whom he had taken as his second wife on November 16, 1921; his natural son, Hilton W. Goodwyn, Jr.; and an adopted son, Robert A. Goodwyn. A third son, James H. Goodwyn, predeceased Hilton W. Goodwyn, Sr. Hilton W. Goodwyn, Jr., and State-Planters Bank of Commerce and Trusts were appointed executors of the Estate of Hilton W. Goodwyn, Sr., on August 10, 1962. A Federal estate tax return was timely filed with the district director of internal revenue at Richmond, Virginia. The decedent lived most of his adult life in Richmond, Virginia, commencing the practice of law in that city in the early 1900's. During the course of 9 his early practice, Goodwyn represented numerous clients in the collection of accounts and began to develop his activities in the area of real estate, organizing *139 Brokerage and Realty Corp., chartered in the State of Virginia on February 21, 1919, to principally serve as his nominee or "street name." Brokerage and Realty Corp. was formally dissolved on March 14, 1945. Goodwyn organized Realty Industrial Loan Corp. (hereinafter referred to as "RILC") which was chartered on August 21, 1934, under the Industrial Loan Act of Virginia, with 300 shares issued and outstanding. Under the law of Virginia, RILC was empowered to loan at "add on" interest rates, for an effective rate of approximately 11 percent if the loan was carried to maturity. The principal business activity of RILC consisted of making second mortgage loans. From its inception, RILC was operated out of offices maintained by the decedent for all of his other business and professional activities. The corporate business operations of RILC were conducted by Goodwyn or carried out under his direct supervision, including title 10 examinations, appraisals, credit checks, note and deed preparations and credit, life, and fire insurance arrangements. For a considerable number of years prior to his death, Goodwyn held licenses as a real estate broker and as an attorney. However, his practice *140 as an attorney came to be confined to the investigation, inception, preparation and supervision of real estate transactions and the legal necessities incident thereto. Decedent's attentions to the accumulations of mortgage paper and contractual relationships were, of necessity, constant. At the time of his death, Goodwyn was employing approximately ten persons who dealt with the public and performed bookkeeping functions for him. Commencing with the year 1938, the decedent caused to be set up and maintained the following five types of books: (1) Day Book, in which all daily cash receipts were originally entered. A separate column was maintained for all major accounts and these were totaled 11 daily and posted to a summary in the Cash Book. Individual entries were also posted to the appropriate customer ledger sheet. (2) Cash Book, in which all disbursements were originally entered. A separate column was maintained for all major accounts and these were totaled monthly and posted in the General Ledger. Daily postings from the Day Book were also totaled monthly. The cash account in the Cash Book was balanced monthly. (3) General Journal, in which all noncash transactions were *141 recorded. (4) General Ledger, in which postings were made monthly from the Cash Book totals and from each General Journal entry. (5) Customer's Post Binder. In addition to the aforementioned records, certain other books were kept primarily for income tax purposes. Depreciation taken was recorded in a "Cost Book" and maintenance expenses were noted in a "Repair Book." A loose-leaf binder was maintained for the recordation of data pertaining to first mortgages. 12 Richards and Russell Trusts By deed, dated January 9, 1943, Brokerage and Realty Corp. of Richmond, Virginia, acting on behalf of the decedent as owner, transferred to the decedent and N. B. Goodwyn, brother of the decedent, as trustees, certain real properties located in or adjacent to the City of Richmond, Virginia, an undivided one-third interest to be held in trust for the use and benefit of Hilton W. Goodwyn, Jr., an undivided one-third interest to be held in trust for the use and benefit of Robert A. Goodwyn, and an undivided one-third interest to be held for the use and benefit of James Henderson Goodwyn, sons of the decedent, upon the following terms and conditions: 1. They [the trustees] shall have full power, *142 to administer and collect the revenue from the said properties and full power to sell and reinvest the same as already indicated and full power to pay out the proceeds, both principal and income, to or for the benefit of the said Beneficiary or to his issue, if any, in case of his death, but the said Trustees shall not in any event apply any part of the income of this trust to the payment of any premiums on any insurance 13 policies on the life of either of the said Trustees, and shall have no right to use any of the funds of the said trust, either principal or income for the private or personal benefit of either one of the said Trustees or to discharge any obligations or duties of the said trustees. 2. That they shall until the death of H. W. Goodwyn, the father of the Beneficiary, pay out of the income as well as the corpus or capital of this trust, that is to say, shall have full authority to make the payments hereinafter indicated either from the income or corpus [sic] as they may see fit and they are authorized to make payments as aforesaid from the sums arising from the said trust as aforesaid to the said Beneficiary or his issue in the case of his death, either to the said *143 Beneficiaries or for his or their benefit in such amounts and at such times as the said Trustees may consider proper, it being the intention of this instrument to give them full and complete powers and discretion in making such payments and no person shall have a right to question their dicscretion or judgment except that the said payments shall be subject to the limitations already set forth. 3. After the expiration of the said period of two years after the death of the said H. W. Goodwyn, Sr., the principal and income remaining from the said property shall be paid and distributed to and among such persons as hereinafter indicated as Hallie M. Goodwyn, (the mother of the said beneficiary) may have appointed in writing to receive the same and if at that time she shall 14 not have made a valid appointment, then the said property and funds remaining therefrom shall be paid and turned over to the Beneficiary under this trust or his issue or heirs (provided of course if he is not of age at the time the trust should be continued until he or they are of age) the said power of appointment to the said Hallie M. Goodwyn is intended for the purpose of using her good offices as well as her *144 love and affection for the benefit of all persons interested and to that end she is authorized to make and revoke such appointment and make new appointments from time to time as she may see fit and of course she may by such appointments, if she sees fit to do so, continue the said trust just as it is and she shall have a right by such appointments to finally dispose of the residue of the said property; but with the further limitations that she shall not at any time or in any event ever be entitled to anything in her own right under this trust, and the right to make such appointments by said Hallie M. Goodwyn must be exercised within the two year period and not later than two years after the death of the said Hilton W. Goodwyn, Sr., and no part of the said property or income shall be appointed by her to any person except the brothers or sisters of said Hilton W. Goodwyn, Sr. or their issue, the brothers or sisters of herself or their issue, or the children of said Hilton W. Goodwyn, Sr. 4. In the event either of the Trustees shall die or become disqualified or decline to act as Trustee under this deed, then his successor may be appointed by the majority vote of the brothers and sisters *145 of the said H. W. Goodwyn, Sr., the said brothers 15 and sisters living at the time, who may make such appointments in writing; and until such appointment is made, the surviving Trustee shall act with full power and authority under this trust. And any statement in writing or recital in the deed by the said acting Trustee shall be sufficient proof that the other Trustee has become disqualified or has declined to act. Any vacancy in the office of the said Trustee may be filled from time to time by the majority vote of such brothers and sisters as aforesaid. Such Trustees appointed as aforesaid shall have the same power and authority as outlined in this agreement. By deed dated January 4, 1944, Brokerage and Realty Corp. of Richmond, Virginia, acting on behalf of the decedent as owner, transferred to the decedent and N. B. Goodwyn, brother of the decedent, as trustees, certain additional real properties located in Richmond, Virginia, an undivided on-third interest to be held in trust for each of the beneficiaries of the trusts created by deed dated January 9, 1943, incorporating therein the terms and conditions of said prior trust. In addition thereto, the deed of January 4, 1944, *146 provided as follows: a. The said Trustees shall follow as nearly as practicable the regular rules and practices usually applied in the administration of the regular traditional 16 trusts by chancery and probate courts but shall not be limited in making investments to regular statutory requirements and shall have authority to sell the said properties and re-invest [sic] the same in such securities as they may consider wise and proper and for the most efficient administration of the said several trusts and shall not be obligated in any event for any loss on any securities caused by error in judgment in any event. a-1 But it is expressly understood that no Trustee under this deed, or substituted Trustee, shall have any right to exercise any power of appointment of any of the said property in favor of himself, his estate, the creditors of his estate or in any manner by which Trustee might receive any benefit from the exercise of such power. b. They shall not engage in any business or make or obtain any loans except so far as may be incidental and necessary for an efficient administration of the said several trusts and to obtain satisfactory amortizing mortgages. And that their activities *147 shall be limited for the most part to collecting the revenue from the said properties and keeping the proceeds of the said properties re-invested [sic] and to this end they shall have a right to anticipate the said revenues in order to take advantage of opportune investments. c. The beneficiaries under the said several trusts shall have no voice or control over any of the affairs of the same. 17 d. If the Trustees under the said several trustss shall find it more economical to do so or more convenient in the handling of the said affairs, they shall have a right to keep all the funds and properties of these trusts along with all the funds and properties of any other trusts that they may have to administer and have a right to keep the same on the same books and accounts along with the funds of any other such trusts, but they shall be required and shall be expected to keep all of the said properties funds, both receipts and disbursements clear and plainly earmarked and identified so that all such funds and items can be readily and conviently [sic] segregated at any time so that the Trustees may be in a position to prepare a clear and concise statements, [sic] showing all receipts *148 and disbursements on account of the said several trusts and the income principal and other facts and particulars that may be necessary and proper for them to show. It is further understood that the 3 trusts created by this instrument are separate from each other and are entirely separate from all other trusts. e. The said grantor hereby orders and directs that all the shares of income and principal and that all of the payments, items and amounts for the various beneficiaries already set forth an provided shall be for the use and benefit, maintenance and support of the several and respective beneficiaries under these several trusts as already set out, and shall not be in any way or manner subject or liable to their, or either of their 18 anticipation, sale, pledge, debts, contracts, engagements or liabilities, and not subject or liable to attachment or execution or sequestration under any legal or equitable or other process. It being the intention of the grantor to take advantage of the provisions of Section 5157 of the Code of Virginia. f. The Trustees will of course be entitled to a reasonable compensation for their services, and they may find it to the benefit of the beneficiaries *149 to use the services for the present of H. W. Goodwyn, Attorney, the grantor herein, if he is willing to serve as he is familiar with the properties and would be expected to take an active personal interest in the matter because of his affection for the beneficiaries. But of course the Trustees have full authority to use such agents or attorneys as they may see fit. g. That the said Trustees shall have the power to decide which items of moneys or properties received by them under this trust shall constitute income and which shall constitute corpus or principal and they shall also have full authority to compromise, adjust and settle any controversy that may arise in connection with any of the said trust property. 19 By deed dated June 8, 1943, Brokerage and Realty Corp. of Richmond, Virginia, acting on behalf of the decedent as owner, transferred to Hallie M. Goodwyn, wife of the decedent, and N. B. Goodwyn, brother of the decedent, as trustees, certain real properties located in the City of Richmond, Virginia, a one-tenth interest to be held in trust for the use and benefit of Grace G. Wrenn, Nannie M. Goodwyn, James H. Goodwyn, Nathaniel B. Goodwyn, Sr., Henry H. Coleman, Joseph *150 R. Johnson, James W. Boisseau, Hallie M. Goodwyn, Sue Shelton, and Elizabeth J. Silver, respectively, upon the following terms and conditions: (1) And the said Trustees shall have free and unlimited discretion to handle, administer, sell, collect, invest and reinvest the said property and the proceeds of the same; and shall have power to make all necessary deeds or contracts to convey or encumber the said property; and to employ all necessary agents and attorneys and pay the expenses of the same out of this trust and are authorized to pay and to use the undivided interest of each beneficiary and the proceeds of the same for such beneficiary and to pay the same to or for the use of the said beneficiaries at such times and in such amounts as the said Trustees shall consider proper. And any deed made by the 20 said Trustees or either of them with the certification as to the failure of the other Trustees to join as hereinafter indicated shall pass good title to any of the said property and no purchaser of the said property or lender or the said property sahll be obligated to see to the application of the purchase money or loan money. (2) But the powers of the said Trustees and the limitations *151 upon the said Trustees are specifically limited and circumscribed as follows: a. The Trustees shall not in any event have the right to pay out any part of the proceeds of any of the said trust either principal or income for the benefit of the grantor of the said trusts or on account of any obligations of the said grantor of the said trusts; or to discharge any legal duty or obligation of the said grantor; or to pay any premiums, dues or charges on any life insurance policies on the life of the said grantor. b. Each and all of the said 10 several and separate trusts already indicated shall be irrevocable and neither the said Trustees nor any or all of the said beneficiaries shall have any right or power to revoke any of the said several and separate trusts in any event or for any purpose. 21 c. That none of the income or principal of the said property conveyed to the said Trustees for the said 10 several and separate trusts shall ever at any time or in any event revert to the grantor or revest in him and that neither the Trustees nor any or all of the said beneficiaries shall have any power whatever to revert or revest any portion of the said properties, either principal or income *152 in the grantor of the said trusts. (3) That so long as the said several and separate trusts indicated are administered by the present Trustees already named or either of them that their powers and discretion in making payments to the said several beneficiaries under the said several and separate trusts shall continue, that is to say that they may make such payments to said Beneficiaries from the said several and separate trusts either principal or income and either directly to the said beneficiary or for their use and benefit at such times and in such amounts as they may consider proper. But should any Trustee or Trustees at a future date be substituted as hereinafter indicated in the place of the said Trustees already named then the new or substituted Trustee shall pay to each of the beneficiaries, either quarterly or semi-annually as the Trustee may decide the income from the said several and separate trusts, that is to say, each beneficiary shall receive 1/10th of the income on the said property but the said trusts shall still continue to be several and separate, that is to say, 10 separate trusts. And in addition to paying the said income 22 periodically as indicated the said *153 substituted Trustees shall also, if they feel that the needs and conditions of such beneficiaries require it, also pay from the principal of the 10 beneficiaries separate trusts an amount up to $150.00 seme-annually [sic] or so much thereof as the Trustees shall feel that the needs and conditions of such beneficiaries shall require. (4) In the event that either of the Trustees shall die or become disqualified or decline to act as Trustees under this deed, then his successor may be appointed by a majority vote of the following persons in whom the grantor of this trust has most implicit confidence, or such of those that may be living and willing to act at that time: Hallie M. Goodwyn, Richmond, Virginia, wife of grantor; Robert E. Peyton, Attorney at Law, Richmond, Virginia; Charles C. Russell, Attorney at Law, Richmond, Virginia; Lloyd M. Richards, Attorney at Law, Richmond, Virginia; Earl B. Jordan, Richmond, Virginia; E. Glenn Jordan, Richmond, Virginia; and Beverly D. Jordan, Richmond, Virginia. Which majority as aforesaid shall make such appointment in writing; and until such appointment is made, the surviving Trustees shall act with full power and authority under this trust and *154 any statement in writing or recital in the deed by the said acting Trustees shall be sufficient proof that the other Trustee has become unwilling 23 or has declined to act. Any vacancy in the office of the said Trustees may be filled from time to time by a majority vote of the said parties indicated above as aforesaid. The said Trustees named in this deed, or either of them, shall have power to make payments to the said beneficiaries without the necessity of the other Trustees joining therein except in case of a payment to a beneficiary who is also a Trustee; in which case the payment shall not be made unless the other Trustees joins or unites [sic] therein. (5) These trusts shall continue until Henry H. Coleman, the youngest death, his oldest living child becomes 23 years of age, unless by unanimous consent of the acting Trustees and also all of the beneficiareis in this trust should decide to discontinue the same. But in the event that this should occur and the acting Trustees and all of the beneficiaries should be legally competent to act and should decide to discontinue this trust, then by proper instrument in writing they shall have a right to do so and in which event the *155 Trustees would either partition and set apart each trust to each beneficiary either by partition in kind or by the sale of the property and the distribution of the proceeds as the Trustees should determine. (6) If, however after the expiration of the period indicated the said Trustees, together with one-half of the beneficiaries of these several and separate trusts, 24 should desire to continue these several and separate trusts for a longer period, then the same shall be continued so long as the Trustees and all of the beneficiaries of five of the said several and separate trusts should wish to continue the same, but not longer than 40 years from the date of this deed. (7) In the case of the death of any one or more of the following beneficiaries: Grace G. Wrenn Nannie M. Goodwyn Joseph R. Johnson James W. Boisseau Sue Shelton Elizabeth J. Silver Then all of the rights of such beneficiaries just named who shall die as aforesaid in the said several and separate trusts shall pass over and vest in Hallie M. Goodwyn and her children, counting and including Robert A. Goodwyn as her child. But in the case of the death of any of the other beneficiaries; the right of such beneficiaries who *156 dies [sic] as aforesaid shall pass to and vest in the issue of such benficiary dying as aforesaid. (8) As special limitations on the powers of the said Trustees, it is further provided: a. The said Trustees shall follow as nearly as practicable the regular rules and practices usually applied in the administration of the regular traditional trusts by chancery and probate courts but shall not be limited in making investments to regular statutory requirements and shall have authority to sell the said properties and 25 re-invest [sic] the same in such securities as they may consider wise and proper and for the most efficient administration of the said several trusts and shall not be obligated in any event for any loss on any securities caused by error in judgment in any event. b. They shall not engage in any business or make or obtain any loans except so far as may be incidental and necessary for an efficient administration of the said several trusts. And that their activities shall be limited for the most part to collecting the revenue from the said properties and keeping the proceeds of the said properties re-invested [sic] and to this end they shall have a right to anticipate the *157 said revenues in order to take advantage of opportune investments. c. The beneficiaries under the said several trusts shall have no voice or control over any of the affairs of the same. d. If the Trustees under the said several trusts shall find it more economical to do so or more convenient in the handling of the said affairs, they shall have a right to keep all the funds and properties of these trusts along with all the funds and properties of any other trusts that they may have to administer and have a right to keep the same on the same books and 26 accounts along with the funds of any other such trusts, but they shall be required and shall be expected to keep all of the said properties funds, both receipts and disbursements clear and plainly earmarked and identified so that all such funds and items can be readily and conveniently [sic] segregated at any time so that the said Trustees may be in a position to prepare a clear and concise statements, [sic] showing all receipts and disbursements on account of the said several trusts and the income, principal and other facts and particulars that may be necessary and proper for them to show. e. The said grantor hereby orders and *158 directs that all the shares of income and principal, and that all of the payments, items and amounts for the various beneficiaries already set forth and provided shall be for the use and benefit, maintenance and support of the several and respective beneficiaries under these several trusts as already set out, and shall not be in any way or manner subject or liable to their, or either of their anticipation, sale, pledge, debts, contracts, engagements or liabilities, and not subject or liable to attachment or execution or sequestration under any legal or equitable or other process. It being the intention of the grantor to take advantage of the provisions of Section 5157 of the Code of Virginia. f. The Trustees will of course be entitled to a reasonable compensation for their services, and they may find it to the benefit of the 27 beneficiaries to use the services for the present of H. W. Goodwyn, Attorney, the grantor herein, if he is willing to serve as he is familiar with the properties and would be expected to take an active personal interest in the matter because of his affection for the beneficiaries. But of course the Trustees have full authority to use such agents or attorneys *159 as they may see fit. By deed dated January 4, 1944, Brokerage and Realty Corp. of Richmond, Virginia, acting on behalf of the decedent as owner, transferred to Hallie M. Goodwyn, wife of the decedent, and N. B. Goodwyn, brother of the decedent, as trustees, certain additional real properties located in the city of Richmond, Virginia, and an undivided one-tenth interest to be held in trust for each of the ten beneficiaries of the trust created by deed dated June 8, 1943, incorporating therein in the terms and conditions of said prior trust. In addition thereto, the deed of January 4, 1944, provided as follows: a.The said Trustees shall follow as nearly as practicable the regular rules and practices usually applied in the administration of the regular traditional trusts by chancery and probate courts but shall not be limited in making investments to regular statutory requirements and shall have authority to sell 28 the said properties and re-invest [sic] the same in such securities as they may consider wise and proper and for the most efficient administration of the said several trusts and and [sic] shall not be obligated in any event for any loss on any securities caused by error *160 in judgment in any event. b. They shall not engage in any business or make or obtain any loans except so far as may be incidental and necessary for an efficient administration of the said several trusts, and to obtain satisfactory amortizing mortgages. And that their activities shall be limited for the most part to collecting the revenue from the said properties and keeping the proceeds of the said properties re-invested [sic] and to this end they shall have a right to anticipate the said revenues in order to take advantage of opportune investments. c. The beneficiaries under the said several trusts shall have no voice or control over any of the affairs of the same. d. If the Trustees under the said several trusts shall find it more economical to do so or more convenient in the handling of the said affairs, they shall have a right to keep all the funds and properties of these trusts along with all the funds and properties of any other trusts that they may have to administer and have a right to keep the same on the same books and accounts along with the funds of any other such trusts, but they shall be required and shall be expected to keep all of the said properties funds, both *161 receipts and disbursements clear and plainly earmarked and identified so that 29 all such funds and items can be readily and conveniently segregated at any time so that the said Trustees may be in a position to prepare a clear and concise statements [sic], showing all receipts and disbursements on account of the said several trusts and the income, principal and other facts and particulars that may be necessary and proper for them to show. It is further understood that the 10 trusts created by this instrument are separate from each other and are entirely separate from all other trusts. e. The said grantor hereby orders and directs that all the shares of income and principal and that all of the payments [sic] items and amounts for the various beneficiaries already set forth and provided shall be for the use and benefit, maintenance and support of the several and respective beneficiaries under these several trusts as already set out, and shall not be in any way or manner subject or liable to their, or either of their anticipation, sale, pledge, debts, contracts, engagements or liabilities, and not subject or liable to attachment or execution or sequestration under any legal or equitable *162 or other process. It being the intention of the grantor to take advantage of the provisions of Section 5157 of the Code of Virginia. f. The Trustees will of course be entitled to a reasonable compensation for their services, and they may find it to the benefit of the beneficiaries to use the services for the present of H. W. Goodwyn, Attorney, the grantor herein, if he is willing to serve as he is familiar with the properties and would be expected to take an active personal interest in the matter because of his affection for the beneficiaries. But of course the Trustees have full authority to use such agents or attorneys as they may see fit. 30 g. That the said Trustees shall have the power to decide which items of moneys or properties received by them under this trust shall constitute income and which shall constitute corpus or principal and they shall also have full authority to compromise, adjust and settle any controversy that may arise in connection with any of the said trust property. h. But it is expressly understood that no Trustees under this deed or substituted Trustee, shall have any right to exercise any power or appointment of any of the said property in favor *163 of himself, his estate, the creditors of his estate or in any manner by which such Trustee might receive any benefit from the exercise of such power. It is the intention of this deed that no property interest, either income or principal shall at any time revest or revert to the grantors herein and in the event of a complete failure of beneficiaries as already provided for any balance which might otherwise revert to the grantor shall be paid to the City of Richmond and this provision shall also apply to the deed from the same grantor to the same Trustees dated June 8, 1943 and recorded in the Clerk's office, Chancery Court of the City of Richmond. N. B. Goodwyn, brother of the decedent, died on October 23, 1951. By document dated November 2, 1951, the then brothers and sisters of the decedent joined in appointing Lloyd M. Richards, an attorney serving as the law librarian to the Supreme Court of Appeals of 31 Virginia, as successor trustee under the trust agreement of January 9, 1943, and the companion trust agreement of January 4, 1944, for a period of 1 year from the date thereof. In an attachment thereto, Mr. Richards accepted the designation as follows: I am accepting the above *164 trust as above indicated and for the period of one year as indicated, but with the understanding that I will have a right to resign at any time should I see fit to do so, by giving notice in writing to Mr. Glenn D. Jordan and Mrs. Grace G. Wrenn. (s) Lloyd M. Richards Through oversight, no document was executed at that time designating Mr. Richards successor to N. B. Goodwyn as trustee of the deed of trust of June 8, 1943, and the companion trust agreement of January 4, 1944. Notwithstanding, Mr. Richards became trustee of record of said trusts as successor to Mr. N. B. Goodwyn, deceased. As of April 1, 1956, the decedent resigned as trustee of the trust agreement of January 9, 1943, and the companion agreement of January 4, 1944. 32 Hallie M. Goodwyn also resigned as trustee of the trust agreement of June 8, 1943, and the companion agreement of January 4, 1944. Thereupon, Charles C. Russell, attorney at law, Richmond, Virginia, was appointed trustee for a period of 1 year from said date in a document bearing the signatures of the brothers and sisters of Hallie M. Goodwyn, grantor, and the brothers and sisters of H. W. Goodwyn, grantor, in accordance with the procedures prescribed *165 in said trusts. The document, which was in the form of a letter addressed to Mr. Russell, reads as follows: Referring to the Trust Agreements as follows: 1. Trust Deed from Edna Sadler, et als to N. B. Goodwyn and H. W. Goodwyn, Trustees dated February 15, 1943 and recorded in the Clerk's Office of the Richmond Chancery Court, Deed Book 436-A, Page 91; Also Trust Deed from Brokerage and Realty Corporation to same Trustees dated Jan. 9, 1943 Deed Book 403-A Page 277; Trust Deed from same to same Trustees dated Jan. 4, 1944 and duly recorded in Clerk's Office, Richmond Chancery Court which is intended as an addition to the last mentioned Trust; Also Trust Deeds from various parties to the same Trustees separate Trust but upon the same general terms as those above stated: Also Trust Deed from Brokerage and Realty Corporation to N. B. Goodwyn and Hallie M. Goodwyn Trustees dated June 8, 1943 and addition to same dated Jan. 4, 1944 both recorded in Clerk's Office of the Richmond Chancery Court. 33 2. The said Deeds of Trust provide that in the case of the death or resignation or refusal to act of any of the said Trustees then a majority of the brothers and sisters of the grantors shall *166 [sic] have a right to designate and appoint substituted Trustees in the place of such who may die or refuse to act. 3. Mr. Lloyd M. Richard has already been substituted as Trustee in the place of Mr. N. B. Goodwyn who died on the 21st of October, 1951 and Mr. H. W. Goodwyn has, as he states, because of declining years and a desire to reduce his responsibilities also resigned as the sole surviving Trustee under the Deeds of Trust indicated; and Mrs. Hallie M. Goodwyn has also resigned as sole surviving Trustee under the other Deeds indicated. And in accordance with the provisions of the said Trust Deeds it now becomes our duty to name and appoint substituted Trustee [sic] in the place of the two resignations as indicated. 4. And now, therefore, we the undersigned to [sic] hereby disignate and appoint you as Trustee under the said Deeds of Trust, to serve as Trustee for a period of one year from this date. Your compensation is to be $50.00 per month and you will of course have a right to resign at any time if you should find the duties burdensome. 34 By an undated document, the fact that neither Mr. Richards nor Mr. Russell had ever been reappointed beyond their initial 1-year *167 terms was sought to be corrected. That document, bearing the signatures of all the surviving brothers and sisters of Hallie M. Goodwyn and H. W. Goodwyn, was addressed to Mr. Richards and Mr. Russell and stated: * * * it was contemplated that you gentlemen would serve until you should be replaced by the appointing authority or by other Trustees appointed in your place. This was contemplated by the appointing authority but it seems that those words were overlooked in the appointing instrument. From the outset until shortly before his death, the decedent exercised control over the investment and management of the trusts hereinbefore described, making all decisions with respect to sales and purchases of property, including transfers as between the respective trusts and other Goodwyn-related entities, and determining the income, if any, to be distributed to the beneficiaries. The actual functions performed by any of the individual trustees in relation to the attention required of these trusts was minimal. 35 In no instance did Richards and Russell, as trustees, undertake any action independently of the decedent. All of the records of each of the aforementioned trusts were kept in the *168 business office of the decedent and were maintained at his direction. Separate books of account were not set up for each of the trusts. No individual accounting statements of balance sheets were prepared for any of these trusts, even to the present date. A single bank account was maintained in the name of Richards and Russell for all of the trusts for which they were trustees. The records of this account were all maintained in decedent's office, as were the actual checks. Periodically, as needed, Mr. Richards and Mr. Russell would come to offices maintained by the decedent to sign blank checks, which would later be filled in by one of decedent's employees at his direction. This procedure was followed for payment for the acquisition of trust assets, of expenses of the trusts, and distributions to beneficiaries. The disbributions received by the income beneficiaries varied from year to year, as did the amounts of each. Some beneficiaries received no distributions. Most of the beneficiaries knew nothing 36 of either Richards or Russell unitl a few years before decedent's death, except that their names appeared on checks enclosed in letters from the decedent. The fiduciary income *169 tax returns for each of the beneficiaries were prepared at decedent's direction by his employees. Richards and Russell would come to the office and sign those returns after they had been completed. The decedent determined what assets were to be acquired, the means of financing those acquisitions, from whom they were to be purchased, and in most, if not all, instances, the price to be paid for them. The same function was his relative to the sale of trust assets. The decedent also controlled the making of loans between one entity and another. Besides the responsibilities he exercised over the trusts he personally created, he also managed other trusts created by his wife through powers of attorney executed to him by the respective trustees. In his notice of deficiency, the respondent has included the assets of the so-called Richards and Russell Trusts in the taxable estate of the decedent. The petitioner contests that determination. 37 Hicks Trust The respondent contended at the trial, and by amendment to his answer, that there should also be included in Goodwyn's gross estate, as gifts in contemplation of death, alleged transfers by the decedent to the "Hicks Trust." By deed *170 dated July 15, 1960, Hallie M. Goodwyn created a trust (hereinafter referred to as the "Hicks Trust") for the benefit of the decedent's sons, sisters, and grandchildren. The corpus of the trust upon its creation was a negotiable note made by Hallie M. Goodwyn in the face amount of $27,000. The trustee named thereunder was Edgar T. Hicks. Hicks died on November 22, 1961. By deed of appointment dated December 2, 1961, and recorded January 23, 1962, Simon J. Levin was duly appointed successor trustee. On the original note for $27,000, $20,075 was paid by Hallie on August 27, 1960. On her U.S. Gift Tax Return for 1960, Hallie reported the estimated fair market value of the note at the date of the gift at $20,250. As reported by Hallie on her 1961 U.S. Gift Tax Return, she made an additional gift to the Hicks Trust on December 18, 1961, in the form of 38 mortgage notes acquired from RILC. On the date of the gift, the reported fair market value of the notes was $41,950. On her U.S. Gift Tax Return for 1962, Hallie reported a gift to the Hicks Trust of additional mortgage notes acquired from RILC having a reported fair market value of $40,150. The date of this gift was January 19, *171 1962. The total value of the gifts made by Hallie to the Hicks Trust was $102,350. The decedent also filed U.S. Gift Tax Returns for the years 1960, 1961, and 1962. In those returns, no gifts to the Hicks Trust by the decedent were reported. The following schedule shows the total gross income, expenses, depreciation, taxable income before the exclusion, income taxes paid, and net after tax income of the Hicks Trust, as disclosed by the U.S. Fiduciary Income Tax Returns filed on behalf of each of the nine beneficiaries for the years 1960, 1961, and 1962: Year
Gross
Expenses
Depreciation
Taxable
Income Tax
Net After
Income
Income
Paid
Tax Income
1960
$9,000.08
--
--
$9,000.08
$1,620.00
$ 7,380.08
1961
20,488.05
--
--
20,488.05
3,949.29
16,538.76
1962
84,322.71
$25,722.97
$4,393.00
41,748.48
9,054.63
32,693.85
Total
$113,810.84
$25,722.97
$4,393.00
$71,236.61
$14,623.92
$56,612.69 39 As of July 27, 1962, the date of decedent's death, the assets of the Hicks Trust included the following: Asset
Amount Cash due from "C & A" account
$332,000.00
Bonds at par value
204,000.00
Real Estate at agreed valuation
163,681.80
Notes at face amount
331,291.56
Total
$1,030,973.36
At all times from July 15, 1960, until shortly prior to decedent's *172 death, the assets of the "Hicks Trust" were in the custody and subject to the management and control of the decedent. No separate bank accounts or records were maintained by the decedent for said trust. As of the date of death, the unexplained or unaccounted for enhancement in the assets of the Hicks Trust exceeded $850 thousand. The petitioner has failed to account for the difference between the sum of the accumulated income and value of the gifts made by Hallie to the trust and the total of the assets claimed to belong to said trust as of the date of death. 40 Other Gifts in Comtemplation of Death By Deed of Gift dated October 10, 1959, H. W. Goodwyn, Sr., and Hallie M. Goodwyn created a trust on three parcels of realty belonging to the decedent. By the terms of the deed, a one-seventh interest was transferred outright to H. W. Goodwyn, Jr., and an equal portion to Robert A. Goodwyn, Sr. The remaining five-sevenths were transferred to H. W. Goodwyn, Jr., and Robert A. Goodwyn, Sr., in trust for the benefit of the five infant children of those two individuals. The total assessed valuation of these parcles, as recited in the deed, as of the date of the instrument was $28,760. *173 The respondent contends that this transfer in trust was a gift in contemplation of death within the meaning of section 2035. On December 15, 1960, H. W. Goodwyn, Sr., and Hallie M. Goodwyn executed a deed creating a trust on 30.40 acres of land belonging to the decedent (hereinafter referred to as the "Gayton Road Property") for the benefit of decedent's two sons, his two sisters, and his wife, Hallie. Hallie, who was also the trustee, 41 received a one-third interest, the remaining beneficiaries each receiving one-sixth. This property was included in decedent's estate on the return at a value of $60,000. The petitioner now contends that the transfer in trust was not, in fact, a gift in contemplation of death within the meaning of section 2035. Life Insurance Policies On May 5, 1939, Hilton W. Goodwyn, Sr., purchased life insurance policies from Jefferson Standard Life Insurance Co. on his own life as follows: Policy No.
Amount
Primary Beneficiary
Secondary
Date of Rider
Beneficiary
Designating
Beneficiaries 675,441
$8,000
James H. Goodwyn
Hallie M. Goodwyn
Apr. 27, 1940
692,371
3,500
H. W. Goodwyn, Jr.
Hallie J. Goodwyn
July 6, 1943
692,372
3,500
James H. Goodwyn
Hallie J. Goodwyn
July 6, 1943
692,373
3,500
Robert A. Goodwyn
Hallie J. Goodwyn
Aug. 30, 1949
692,374
1,000
Ernest L. Faison
Beatrice B. Faison
Apr. 26, 1940
*174 In each of the riders attached to the policies, the decedent relinquished the rights to change the designation of the beneficiary to "receive every benefit, exercise every right and enjoy every privilege conferred upon the insured by the policy." 42 The riders to the policies numbered 675,441 and 692,374 provided: It is understood that this policy is for the special benefit of * * * [Hallie M. Goodwyn and Ernest L. Faison, respectively] and the insured shall have no right to exercise any privilege conferred upon the insured by this policy without the consent of the said * * * [Hallie M. Goodwyn and Ernest L. Faison, respectively]. The riders to the policies numbered 692,371 and 692,372 provided: * * * the insured shall not have the right to further change the beneficiary during the life of * * * [the primary or secondary beneficiaries] without their written consent. The rider to policy No. 692,373 provided: * * * the insured shall not have the right to further change the beneficiary during the life of the said Robert Armstead Goodwyn and Hallie Jordan Goodwyn, without the written consent of the said Hallie JordanGoodwyn. Each of the foregoing policies with the exception of No. *175 692,374, was assigned as collateral to the State-Planters Bank of Commerce and Trusts on January 5, 1961. 43 The signatories on the assignments of the policies were as follows: Policy
Signatories No.
675,441
Hilton W. Goodwyn, Hallie Jordan Goodwyn
692,371
Hilton W. Goodwyn, Hallie Jordan Goodwyn, Hilton Warner Goodwyn, Jr.
692,372
Hilton W. Goodwyn, Hallie Jordan Goodwyn
692,373
Hilton W. Goodwyn, Hallie Jordan Goodwyn, Robert Armstead Goodwyn
The assignments provided that the assignment was made "as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee." The assignee had the right to surrender values, but covenanted that the right would not be exercised unless there was a default in payment of the liability or a failure to pay any premium due on the policy. On June 3, 1927, Goodwyn was issued a life insurance policy No. 1998293 by the Northwestern Mutual Life Insurance Co. It appears from the record that sometime thereafter the policy was assigned to the Central National Bank of Richmond. That assignment was released *176 44 by the Bank on December 19, 1938. On December 20, 1938, the policy was assigned by the decedent to Hallie M. Goodwyn, who was the beneficiary, or her estate. On December 21, 1938, Hallie assigned the policy back to the Central National Bank of Richmond. [2] By letter dated January 5, 1939, the decedent requested that Hallie M. Goodwyn be designated the beneficiary as of December 20, 1938. The change of beneficiary privilege was waived therein. On January 26, 1942, Hilton W. Goodwyn and Hallie M. Goodwyn executed an assignment of the policy as collateral to the Bank of Commerce and Trusts of Virginia. The assignment provided that it was made "as collateral security for any and all liabilities of the undersigned and/or any of them to the Assignee now existing and/or hereafter arising * * *." 45 By a document entitled "RELEASE AND REASSIGNMENT OF POLICY" dated December 2, 1948, Hallie M. Goodwyn released and reassigned to the decedent all the interest in policy No. 1998293 acquired by her by the December 20, 1938, assignment. On May 27, 1949, Hilton *177 W. Goodwyn, Sr., and Hallie M. Goodwyn executed a "Designation of Direct Beneficiary" form which provided in pertinent part: All designations of Direct Beneficiaries * * under the above numbered policy [1998293] are hereby revoked. As Direct Beneficiary, or as Direct Beneficiaries in equal shares, the survivors or survivor, the following are designated: Hallie M. Goodwyn wife * * * The right to change this designation, to obtain loans from the Company upon the security of the policy, and to surrender the policy for its cash value is reserved to the Insured without consent or participation of any Direct Beneficiary. The foregoing designation was the last endorsement on this policy executed by the decedent. 46 OPINION Richards and Russell Trusts By deed dated January 9, 1943, the decedent caused to be transferred certain real properties to himself and N. B. Goodwyn, his brother, as trustees, to be held for the use and benefit of his three sons. By deed dated January 4, 1944, certain additional properties were transferred to the decedent and his brother, as trustees, for the same purposes. Subsequently, the decedent's brother died and the decedent resigned as trustee, causing Mr. Lloyd *178 M. Richards and Charles C. Russell, attorneys at law, to be appointed as trustees. Notwithstanding any lapses in their original appointments, it is admitted that as of the date of death of the decedent Richards and Russell were, and for some years prior thereto, had been trustees in name, if not in fact, of these trusts. Similiarly, by deed dated June 8, 1943, the decedent caused to be transferred to Hallie M. Goodwyn, his wife, and N. B. Goodwyn, his brother, certain real properties to be held in trust for the 47 use and benefit of other members of the family. By deed dated January 4, 1944, additional real properties were transferred to said trustees for the same purposes. Upon the death of N. B. Goodwyn, and the resignation of Hallie M. Goodwyn, as trustee, Richards and Russell likewise became trustees in name, if not in fact, of these trusts and were so acting upon the death of the decedent. Under the terms of the deeds creating these trusts, the trustees were granted broad discretionary powers with respect to both the distribution of income to the beneficiaries and the investment and management of the corpus of the trusts. Notwithstanding the designation of Richards and Russell *179 as trustees, it further appears that at all times from the establishment of the trusts until his last illness, the decedent exercised complete control with respect to the purchase and sale of trust assets, investment of any proceeds, and the determination of the amounts, if any, to be distributed to the respective beneficiaries. 48 The assets of the various trusts, together with other trusts, as well as property owned by the decedent, were accounted for by a single set of records maintained in the offices of the decedent. Except for the Federal income tax returns prepared and filed by the decedent on behalf of the various trusts, no separate records were maintained showing the assets and income of any of these trusts. The respondent argues that the decedent should be treated as trustee, in fact, possessing such rights and powers as to cause the inclusion of the assets thereof in his gross estate, relying on sections 2033, 2036(a) (2), and 2038. Section 2033 requires a finding that the decedent had an interest in the assets of the trusts at the time of his death. [3] *181 49 There is no basis for such a finding. Section 2038(a) (1) relates to "a power" exercisable by the decedent "to alter, *180 amend, revoke, or terminate," the trusts.[4] No such power was reserved by the decedent. Accordingly, in the final analysis the respondent's position is predicated on the determination that by reason of the de facto control 50 exercised by the decedent the trusts are includable in his estate pursuant to section 2036(a) (2). [5] *182 It is clear that the powers granted to the trustees would, if reserved by the decedent, be such as to require the inclusion of the assets of the trusts in the estate of the decedent. United States v. O'Malley, 383 U.S 627 (1966). Does the fact that the decedent was able to exercise such powers through the cooperation of unrelated trustees require a different result? The question thus presented for 51 decision is whether the value of such trusts is includable in the estate of the decedent by reason of the de facto control over the trusts exercised by the decedent, notwithstanding that no power to exercise such control was reserved to or by the decedent once he resigned his duties as trustee of certain of these trusts. In the course of the trial of this case, and in his briefs, respondent made no secret of the fact that support for respondent's position was to come from the decision of the U.S. Supreme Court in the case of United States v. Byrum then pending on writ of certiorari from the U.S. Circuit Court of Appeals for the Sixth Circuit (440 F. 2d 949). The Supreme Court has since rendered its decision in that case, 408 U.S. 125 (1972). By that decision, the Supreme Court has rejected the position of the respondent in the instant case that the de facto exercise on control over the management and investment of the trust res is within the ambit of section 2036. 52 In distinguishing United States v. O'Malley, supra, the Supreme Court in the Byrum case said: In our view, and for the purposes of this *183 case, O'Malley adds nothing to the statute itself. The facts in that case were clearly within the ambit of what is now § 2036(a) (2). That section requires that the settlor must have "retained for his life * * * the right * * * to designate the persons who shall possess or enjoy the property or the income therefrom." O'Malley was covered precisely by the statute for two reasons: (1) there the settlor had reserved a legal right, set forth in the trust instrument; and (2) this right expressly authorized the settlor, "in conjunction" with others, to accumulate income and thereby "to designate" the persons to enjoy it.
It must be conceded that Byrum reserved no such "right" in the trust instrument or otherwise. The term "right," certainly when used in a tax statute, must be given its normal and customary meaning. It connotes an ascertainable and legally enforceable power, such as that involved in O'Malley. Here, the right ascribed to Byrum was the power to use his majority position and influence over the corporate directors to "regulate the flow of dividends" to the trust. That "right" was neither ascertainable nor legally enforceable and hence was not a right in any normal sense of *184 that term. The right or power upon which the tax is predicated must thus be a legal right reserved in the trust instrument, or at least by some form of agreement between the trustees and the settlor. Admittedly, such a right did not exist in the case of the Richards and Russell Trust. To hold otherwise would not only 53 be contrary to the reasoning of the Supreme Court in the Byrum case but would present the insuperable problem of determining to what degree compliance on the part of unrelated trustees with the wishes of the grantor would be sufficient to constitute requisite control over the trust res within the meaning of section 2036. It would indeed be an unusual situation for a grantor to appoint trustees, whether corporate or otherwise, in the expectation that such trustees would, where given a choice, act contrary to the wishes and intent of the grantor. Notwithstanding that Richards and Russell permitted the decedent full discretion in the management of these trusts, as a matter of law the trustees were responsible and answerable for the decedent's acts on their behalf. See 2 Scott, Trusts 1388 (3d ed., 1967); 3 Scott, Trusts 1794 (3d ed., 1967). Had they so elected, Richards *185 and Russell could have taken control of the trust res at any time. 54 Hicks Trust The "Hicks Trust" was established by Hallie M. Goodwyn through gifts in the years 1960, 1961, and 1962 with a reported value of $102,350. Gross income earned by the "Hicks Trust" in the years 1960, 1961, and 1962 was reported to be $113,810.84, resulting in a "cash flow" of $61,005.69. As of the date of decedent's death, the assets claimed to be held in the "Hicks Trust" totaled $1,030,973.36. When counsel for the respondent were apprised during the course of the trial of the value of such assets allocated to the "Hicks Trust," the respondent took the position that the excess between the value of such assets and the amounts attributable to gifts to the trust by Hallie necessarily flowed from the decedent, since only the decedent was in a position, by virtue of having control of the properties, to effect the transfer of assets from other sources 55 within the control of the "Hicks Trust." As such, the transfers would be in contemplation of death within the meaning of section 2035. [6] *186 Having raised this issue for the first time at the trial, the respondent has the burden of proof. Rule 32, Tax Court Rules of Practice. To meet that burden, the respondent must make a prima facie showing that the operative elements of section 2035(b) 56 are present. He must therefore establish that "the decedent within a period of 3 years ending with the date of his death *187 * * * transferred an interest in property, relinquished a power, or exercised or released a general power of appointment," without adequate and full consideration. Those items once established, the petitioners can prevail only by proving "by a fair preponderance of the evidence" that the transfer was not made in contemplation of death. Estate of Nathalie Koussevitsky, 5 T.C. 650 (1945). The value of the original gifts by Hallie to the Hicks Trust and the income as reported by the trust during the period from the initial gift on July 15, 1960, to the date of death of the decedent are a matter of record. At the trial evidence was presented which indicated that the assets in the Hicks Trust amounted to $1,030,973.36. As a result, there was an unaccounted for enhancement of more than $850 thousand in the value of that trust. Respondent's counsel thereupon amended his answer to include this unaccounted for enhancement in the estate of the 57 decedent on the grounds that the amount in question must have constituted gifts from the decedent in contemplation of death within the 3-year period. At this point, the Court concluded that it was incumbent upon petitioner to account for the disparity *188 between the amounts contributed to the trust and the value claimed to be excludable from the estate on account of the trust. Frank Cole, 30 T.C. 665 (1958). When called upon to meet this burden, counsel for the petitioner elected to rest on the record.[7]
In this case, the records maintained by the decedent were wholly inadequate for the Internal Revenue Service in the examination of the estate tax return of the decedent to identify and to segregate the assets belonging to each of the trusts and other taxable entities managed by the decedent. As counsel for the petitioners freely admitted in the colloquy referred to above, there was never at any time a trial balance prepared showing the assets and liabilities for each of the various trusts. In such 58 circumstances, resort by the respondent to a net worth computation in the determination of taxable income has long been established. It is simply a matter of evidentiary proof. Holland v. United States, 348 U.S. 121 (1954); see Lowell F. Bushnell, 49 T.C. 296, 311 (1967). In this context, we find no reason to adopt a different standard in the determination of the taxable estate.
In this case, *189 the facts clearly establish that all aspects of the various trusts, including transfers as between trusts, sales and reinvestment of the proceeds of such sales, the collection of notes held by the trusts, the granting of extensions and refinancing of such notes, and all other business decisions were made by the decedent. In the short space of 2 years, the assets attributable to the Hicks Trust reflect an unaccounted for "windfall." Unless we are to assume that the decedent was plundering the assets of other trusts in order to enhance the value of the Hicks Trust, this "windfall" must have been attributable, at least in part, to the decedent. 59 Upon the basis of the record before the Court, we so find. As such, the transfers would necessarily be within the time prescribed in section 2035 and lacking any proof on the part of petitioners, constitute gifts in comtemplation of death within the meaning of that section. Other Gifts in Contemplation of Death The respondent has determined that the value of three parcels of real estate transferred in trust by Hilton W. Goodwyn and Hallie Goodwyn on October 10, 1959, and the value of a 30.40 acre parcel of real estate (hereinafter referred *190 to as the "Gayton Road Property") transferred in trust by Goodwyn and his wife on December 15, 1960, [8] should be included in the decedent's gross estate as a transfer in contemplation of death under the provisions of section 2035. 60 Both of the foregoing transfers were made within the 3-year period immediately preceding Goodwyn's death, thereby placing the burden on the petitioners to establish that such transfers were not, in fact, made in contemplation of death. Section 20.2035-1, Estate Tax Regs. The petitioners presented no evidence from which the Court can find that these gifts in trust were not made in contemplation of death. In fact, such evidence as appears in the record would support the respondent. Accordingly, the value of the realty transferred in trust on October 10, 1959, and the value of the "Gayton Road Property" transferred in trust on December *191 15, 1960, is includable in decedent's gross estate. 61 Life Insurance Policies In the determination of the deficiency, the respondent has also included in the taxable estate of the decedent, the proceeds of certain policies of insurance on the life of the decedent as follows: Policy
Amount Included Northwestern Mutual Life Insurance Co. - #1998293
$61,469.89
Jefferson Standard Life Insurance Co. - #692,374
1,000.00
Jefferson Standard Life Insurance Co. - #692,373
3,500.00
Jefferson Standard Life Insurance Co. - #692,372
3,500.00
Jefferson Standard Life Insurance Co. - #692,371
3,500.00
Jefferson Standard Life Insurance Co. - #675,441
8,000.00 62 With respect to those policies, the respondent has determined that the decedent possessed incidents of ownership in the policies causing them to be includable in his gross estate pursuant to section 2042(2). [9] *192 Northwestern Mutual Policy No. 1998293 The Northwestern Mutual Life Insurance Co. issued its policy, numbered 1998293, to Hilton W. Goodwyn, on his life, on June 3, 1927. Thereafter, the policy was assigned to the central National Bank of Richmond, which assignment was released by the Bank on December 19, 1938. On December 20, 1938, 63 decedent assigned the policy to the beneficiary, his wife, Hallie, or to her estate should she predecease him. On December 21, 1938, the policy was assigned by Hallie to the Central National Bank of Richmond, which assignment was apparently released sometime prior to February 2, 1942. By letter of January 5, 1939, the decedent instructed the insurance company to designate his wife, Hallie, as the beneficiary, effective as of December 20, 1938, and notified them of his waiver of the privilege of changing the beneficiary. As of that date, it is clear that the decedent no longer possessed any incidents of ownership in the policy. On January 29, 1942, Hilton W. Goodwyn and Hallie M. Goodwyn both signed an assignment *193 of the policy to the Bank of Commerce and Trusts of Virginia, which provided that the assignment was made "as collateral security for any and all liabilities of the undersigned and/or any of them to the Assignee now existing and/or hereafter arising * * *." Since it is not necessary to our determination as to this policy, we will not now pass upon whether such an assignment created an "incident of ownership" in the decedent. 64 On December 2, 1948, Hallie M. Goodwyn executed a "Release and Re-assignment of Policy" which provided: In order to release and relinquish all interest acquired by assignment dated December 20, 1938 from the assignor(s) therein, [decedent] the undersigned, for value received, hereby releases and reassigns to said assignor(s) all right, title and interest in and to policy number(s) 1998293 issued by The Northwestern Mutual Life Insurance Company of Milwaukee, Wisconsin, on the life of Hilton W. Goodwyn. Thereafter, on May 27, 1949, the decedent again designated Hallie as the beneficiary. In the designation form, also signed by Hallie, the right to change the beneficiary, to obtain loans from the insurer, and to surrender the policy was expressly reserved to *194 the decedent. While admitting that the power to change the beneficiary is a proprietary interest which, at death, passes a significant economic benefit to the named beneficiary, the petitioners contend that the effect of the January 29, 1942, assignment was to prevent the "acquisition or bestowing of [that] economic benefit." They argue that because the 65 assignment had not been released by the Bank, the decedent possessed only a possibility that he would be able to exercise his power to change the beneficiary and that this possibility had no economic significance at the time of his death. We find the petitioners' contention to be without merit. The cases interpreting the provisions of section 2042 and its predecessor sections have long held the proceeds of life insurance to be includable in the decedent's gross estate where his death caused the benefits to the survivor to become fixed or vested. See Chase Nat. Bank v. United States, 278 U.S. 327 (1929): Sampson v. United States, 1 F. Supp. 95 (D. Mass. 1932); Ballard v. Helburn, 9 F. Supp. 812 (W.D. Ky. 1933), affd. 85 F. 2d 613 (C.A. 6, 1936). Nor does the impracticality of exercising such a power eliminate the application *195 of the tax. Commissioner v. Noel Estate, 380 U.S. 678 (1965). Further, on strikingly analogous facts, the Sixth Circuit has held the proceeds of a life insurance 66 policy includable in the estate of a decedent who had the right to designate the beneficiary, where the policy had been assigned to a bank as security for a corporate debt. Piggott's Estate v. Commissioner, 340 F. 2d 829 (C.A. 6, 1965). See also Nelson v. Commissioner, 101 F. 2d 568 (C.A. 8, 1939). We are in agreement with the decision in Piggott's Estate, supra, and find the reasoning therein equally applicable to the case before us. By reason of his power to change the beneficiary of the policy, at his death, H. W. Goodwyn, Sr., possessed such an incident of ownership in Northwestern Life Insurance Policy No. 1998293 to require its inclusion in his gross estate under section 2042. Jefferson Standard Policy No. 692,374 The Jefferson Standard Life Insurance Co. issued its policy, numbered 692,374, to Hilton W. Goodwyn, on his life, on May 5, 1939, in the face amount of $1,000. By rider dated April 26, 1940, the decedent 67 designated a primary and secondary beneficiary and caused the following clauses of the original *196 policy to be voided: The insured may, without the consent of the beneficiary, receive every benefit, exercise every right and enjoy every privilege conferred upon the insured by this policy, and Provided this policy be not assigned, the insured may at any time, and from time to time, change the beneficiary hereunder * * *. In addition, the rider provided that the primary beneficiary could, without the consent of the insured, receive, exercise and enjoy every benefit, right and privilege formerly held by the decedent and expressly stated that the insured had no right to exercise any privilege conferred upon him by the original policy without the consent of the primary beneficiary. We think it clear that both the intent and the effect of the April 26, 1940, rider was to transfer complete ownership rights in Jefferson Standard Policy No. 692,374 from the decedent to the beneficiary. 68 We do not find the language of the rider indicative of a retention by the decedent of any rights in or to the benefits of the policy, and we do not interpret the provision of the rider prohibiting the insured from exercising any privilege thereunder without the consent of the beneficiary to mean that the *197 decedent could do so "in conjunction with any person." See Morton v. United States, 457 F. 2d 750 (C.A. 4, 1972). To hold otherwise would mean that an individual could never divest himself of all of the incidents of ownership in his life insurance policies, for the decedent here had no more power or right to change the beneficiaries or exercise any privileges under the policy than had the rider been completely silent on these points. Even absent such a provision, the beneficiaries could have acceded to a request by the decedent to exercise one of the "incidents of ownership," but where they have the unqualified right to refuse and where such an accommodation is adverse to their interest, no "right" is held by the decedent as would constitute an incident of ownership. 69 Therefore, the respondent's determination that the proceeds of Jefferson Standard Policy No. 692,374 should have been included in Hilton W. Goodwyn, Sr.'s gross estate is erroneous. Jefferson Standard Policies Nos. 675,441, 692,371, 692,372 Policy No. 675,441 was also issued by Jefferson Standard Life Insurance Co. on May 5, 1939. The rider attached thereto, dated April 27, 1940, was identical in all material respects *198 to that attached to policy No. 692,374 previously discussed, with the sole exception that the relinquishment by the decedent of his rights thereunder was made in favor of the secondary beneficiary as trustee for the primary beneficiary. That distinction is not material to the present inquiry. Therefore, with the execution of the rider of April 27, 1940, the decedent relinquished all of his rights and privileges under the policy and at that time possessed no "incidents of ownership" therein. 70 Policies numbered 692,371 and 692,372 were also issued by Jefferson Standard Life Insurance Co. on May 5, 1939. By riders attached to each, dated July 6, 1943, the policy clauses granting the decedent the rights, benefits and privileges under the policy and granting him the right to change the beneficiary were voided. The riders additionally provided that the decedent "shall not have the right to further change the beneficiary during the life of * * * [the primary beneficiary] and * * * [the secondary beneficiary] without their written consent." For the same reasons stated above, we hold that with the execution of these riders, the decedent relinquished all of his rights in these two policies *199 and at that time no longer possessed any "incidents of ownership" in them. [10] 71 However, each of these policies, numbered 675,441, 692,371, and 692,372 was assigned to the State-Planters Bank of Commerce and Trusts, Richmond, Virginia, on January 5, 1961. The language of each of those assignments critical to the issue before us provided: This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee * * *. The assignments of policies numbered 675,441 and 692,372 were signed by Hilton W. Goodwyn and Hallie Jordan Goodwyn. The assignment of policy No. 692,371 was signed by Hilton W. Goodwyn, Hallie Jordan Goodwyn, and Hilton Warner Goodwyn, Jr. *200 We must therefore decide whether the decedent possessed any "incidents of ownership" in these policies by virtue of his execution of the assignment forms. The petitioners contend that even if the language of the assignments just quoted operated to give Hilton W. Goodwyn the right to borrow from the Bank with the policies as security, he did not thereby acquire an 72 "incident of ownership" in those policies. Rather, they argue, the decedent simply received an accommodation from his wife, and his son, who held complete ownership of the policies. We are in agreement with the petitioners. As we have previously stated, at the time the assignments were executed, the decedent possessed no ownership interests in the policies. Unlike the case of Commissioner v. Karagheusian's Estate, 233 F. 2d 197 (C.A. 2, 1956), where the proceeds of a life insurance policy were included in the decedent's gross estate because his consent was necessary for any alteration of the trust in which the policy was held even though he had never "owned" the policy, here the decedent's approval was not required for the exercise of any ownership rights in the policies, nor could he "veto" any exercise of those *201 rights. See United States v. Rhode Island Hospital Trust Company, 355 F. 2d 7 (C.A. 1, 1966). 73 The instant case more closely parallels the situation presented in Estate of Skifter v. Commissioner, 468 F. 2d 699 (C.A. 2, 1972), affirming 56 T.C. 1190 (1971). In that case, the decedent, as trustee, was given broad powers over the corpus of a trust created by his wife, which included life insurance policies previously owned by him. In holding that the policies were not includable in the decedent's gross estate, the Court of Appeals for the Second Circuit was convinced that Congress intended "that § 2042 was not to operate in such a manner as to discriminate against life insurance, with regard to estate tax treatment, as compared with other types of property." See also In Re Estate of Lumpkin, 474 F. 2d 1092 (C.A. 5, 1973). While we recognize that in Estate of Skifter, supra, the decedent had no power to exercise his rights as trustee for his own benefit, which alone may distinguish it from the instant inquiry, we share that court's conviction that Congress intended no disparity between life insurance and other forms of 74 property. We must therefore ask whether any other type of *202 property, assigned by the decedent's wife to a bank for his debts as well as hers, would be includable in his gross estate where he had previously owned it.For example, assuming that Hallie had assigned stock, or real estate, which she alone possessed, as security for her debts or those of her husband, would that property be includable in H. W. Goodwyn's gross estate under any other of the estate tax provisions? We think not and therefore decline to interpret section 2042 as requiring the inclusiion of the proceeds of life insurance policies numbered 675,441, 692,371, and 692,372 in Goodwyn's gross estate. The assignment of a life insurance policy by the independent owner thereof as an accommodation to the insured does not create in the assured an "incident of ownership" in that policy where he possesses no other rights or privileges therein. 75 Jefferson Standard Policy No. 692,373 Policy No. 692,373 was issued to Hilton W. Goodwyn on his life by Jefferson Standard Life Insurance Co. on May 5, 1939. By rider dated August 30, 1949, the policy clauses granting the decedent rights, benefits and privileges thereunder and granting him the right to change the beneficiary were expressly *203 voided. The rider further provided: * * * Robert Armstead Goodwyn, foster son of the insured, if living, otherwise to Hallie Jordan Goodwyn, wife of the insured, shall be named as beneficiary in the policy and the insured shall not have the right to further change the beneficiary during the life of the said Robert Armstead Goodwyn and Hallie Jordan Goodwyn, without the written consent of the said Hallie JordanGoodwyn. While the provisions of this rider initially appeal to be akin to those of the foregoing policies, which we regarded as falling within the scope of Morton v. United States, supra, such is not the case. In each of the foregoing policies, the rights of the beneficiaries, both primary and secondary, were vested and the decedent could take no action without each of their consents to diminish their 76 interest. In this instance, however, the decedent needed only the consent of the contingent beneficiary, his wife, Hallie, to terminate the interest of Robert Armstead Goodwyn. Therefore, the primary beneficiary's interest in the policy was not vested and the decedent's power, exercisable in conjunction with another whose financial interests might very well be enhanced *204 by its exercise, clearly constitutes the ability to shift the economic benefits of the policy with the primary beneficiary. Ballard v. Helburn, supra.The rationale of the Morton case is not applicable to policy No. 692,373 and its proceeds are therefore includable in decedent's gross estate. In accordance with the foregoing, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. While it is not clear from the record, it appears that this assignment was released by the Bank sometime prior to February 2, 1942. ↩
3. SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST. The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death. 4. Sec. 2038(a) (1) provides: SEC. 2038. REVOCABLE TRANSFERS. (a) In General. - The value of the gross estate shall include the value of all property - (1) Transfers after June 22, 1936. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death. ↩
5. Sec. 2036(a) (2) provides: SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death - * * * (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. ↩
6. Sec. 2035 provides, in material part: SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *. ↩
7. Hearing, September, 13, 1972, Tr. 41-46. ↩
8. The Gayton Road Property was included in Goodwyn's estate tax return at a value of $60,000 as real estate owned by the decedent. In his statutory notice of deficiency, the respondent disallowed the petitioners' claim that the inclusion was erroneous, having determined that the transfer was made in contemplation of death. ↩
9. Sec. 2042 provides, in pertinent part: SEC. 2042. PROCEEDS OF LIFE INSURANCE. The value of the gross estate shall include the value of all property - * * * (2) Receivable by other beneficiaries. - To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. * * * 10. We note that under sec. 2042(2), the decedent may have held a "reversionary interest" in these policies. However, neither of the parties have addressed themselves to this issue and there is no evidence in the record indicative of the value of such an interest, if any. We therefore decline to pass upon the point. ↩