Gilman Paper Company v. Commissioner.Gilman Paper Co. v. CommissionerDocket No. 62018.United States Tax CourtT.C. Memo 1960-13; 1960 Tax Ct. Memo LEXIS 276; 19 T.C.M. (CCH) 81; T.C.M. (RIA) 60013; February 5, 1960Joseph J. Klein, Esq., 42nd Street, New York, N. Y., for the petitioner. Clarence P. Brazill, Jr., for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1951 and 1952 in the respective amounts of $127,544.74 and $1,785.77. It has since been stipulated that there is no deficiency for 1952. The sole issue for decision is whether respondent erred in disallowing the deduction in 1951 of $140,000 as compensation of petitioner's president, Charles Gilman. Findings of Fact The petitioner was incorporated under the laws of New Hampshire in 1897 and maintains its principal office at New York, New York. Its income tax return for the calendar year 1951 was prepared on*277 the accrual basis and was filed with the then collector of internal revenue, Burlington, Vermont. The petitioner had been founded by Isaac Gilman. At the time of his death on August 27, 1944, the petitioner corporation owned all or the majority of the stock of the following corporations: Gilman Electric Light & Power Co. The Cellucord Corporation Northern Kraft Co. Kraft Bag Corporation St. Marys Kraft Corporation St. Marys Timber Co. St. Marys Railroad Co. Isaac Gilman was president and majority shareholder in the petitioner corporation prior to his death at the age of 79. Subsequent to his death and through at least 1951, Charles Gilman, Isaac's son, was president of petitioner. Prior to Isaac's death and specifically on June 22, 1940, the outstanding stock of the petitioner corporation was held as follows: Number ofShares ofName of StockholderCommon StockIsaac Gilman15,999Charles Gilman (Isaac's son)5,001Leah Shapiro (Isaac's daughter)1,000Sadie Collier (Isaac's daughter)1,000Celia Frank (Isaac's daughter)1,000Pauline Ballin (Isaac's daughter)1,000Total Outstanding Shares25,000On June 22, 1940, the petitioner, *278 Isaac Gilman and his son Charles entered into an agreement which provided: "(a) that the petitioner corporation be recapitalized by exchanging 25,000 shares of nonvoting preferred stock for the outstanding stock; that Isaac Gilman was to receive 6 shares and Charles Gilman 4 shares of common stock having exclusive voting right; and no new common voting stock was to be issued other than the 10 shares to Isaac Gilman and Charles Gilman; "(b) that on the death of Isaac Gilman, Charles Gilman would have the option of purchasing from Isaac Gilman's estate two of the 6 shares of the voting common stock; "(c) that, upon Charles Gilman's exercise of said option, he would enter into an agreement in writing, in part, as follows: * * * that so long as he [Charles Gilman] shall be employed by Gilman Paper Company and/or any one or more of the subsidiaries or affiliated companies of the said Gilman Paper Company that any compensation, that the said Charles Gilman shall receive for services rendered or to be rendered in excess of $30,000 per year, plus 10% of the net profits of the Gilman Paper Company in excess of $200,000 in any one year as computed for federal income taxes, shall be received*279 by said Charles Gilman as trustee for the benefit of all stockholders of the said Gilman Paper Company * * *." On October 20, 1944, following the death of Isaac, Charles exercised his option pursuant to the agreement of June 22, 1940, and purchased two shares of petitioner's common voting stock which then gave him 60 per cent of the outstanding common voting stock. As part of the same agreement of October 20, 1944, Charles entered into the compensation agreement described under (c), above. On October 5, 1945, the petitioner's board of directors consisted of Charles Gilman, Charles Ballin and Morris Gintzler. Charles Gilman on that date was majority shareholder, president, and chairman of the board of directors of the petitioner. Charles Ballin, Charles Gilman's brother-in-law, was a nonstockholder and an employee of the petitioner. Morris Gintzler was neither an employee nor a stockholder of the petitioner and was one of the executors of the Last Will and Testament of Isaac. On October 5, 1945, the above-named directors of the petitioner corporation met with Charles Gilman as chairman. He announced that the purpose of the meeting was to consider his own compensation as president*280 and described the terms of the 1940 agreement. Thereupon, the directors, with Charles not voting, adopted a resolution which provided as follows: "RESOLVED, that the annual salary of the President, Charles Gilman, from this Company commencing January 1st, 1945 shall be a sum equal to 10% of the net profits of this Company in excess of Two Hundred Thousand Dollars ($200,000.00) in any one year as reported by the auditors for the Company in their annual report before deduction of the amount of compensation to be paid and before provision for Federal Income Taxes, and it was further "RESOLVED, that the said Charles Gilman may draw monthly, at his option, against this compensation and it was further "RESOLVED, that upon completion by the auditors of their report, an adjustment of the salary of the said Charles Gilman for the year shall be made, and the Company shall be credited with any advances made to the said Charles Gilman during said year, and in the event such drawings shall be less than the amount to be paid to the said Charles Gilman, that the Company shall immediately pay to said Charles Gilman the difference, and if the drawings of the said Charles Gilman shall be in excess*281 of the amount to become due him, as provided for above, that the said Charles Gilman shall immediately repay to the Corporation such excess, and it was further "RESOLVED, that this compensation shall be in full force and effect until further order of this Board." During 1951 the petitioner's outstanding stock was held as follows: Number of SharesName of StockholderPreferredCommonCharles Gilman5,241Trust u/i dated June 30, 1948,for benefit of Howard Gil-man and Charles Gilman,Jr. (Children of CharlesGilman, grantor)6Herman Gilman100Family of Leah Shapiro1,1401Family of Sadie Collier1,1401Family of Celia Frank1,1401Family of Pauline Ballin1,1401Totals9,90110Treasury stock15,099Total Outstanding Stock25,00010 Charles controlled the six shares of common stock held in trust for his children. On his return for the year 1951, Charles reported the following amounts as compensation and director's fees from the petitioner, its subsidiaries and the International Folding Paper Box Co., Inc.: Compen-Director'sName of CompanysationFeesGilman Paper Company$336,000.00 *$ 500.00Kraft Bag Corporation20,000.0020.00The Cellucord Corporation10,000.00200.00International Folding Pa-per Box Co., Inc.12,000.00100.00St. Marys Kraft Corpora-tion0200.00$378,000.00$1,020.00*282 During the year 1951, the petitioner's board of directors consisted of Charles Gilman, Chairman, Howard Gilman and Charles Ballin. Howard Gilman is Charles' son. His compensation from the petitioner and its subsidiaries in the taxable year 1951 amounted to $23,000. Charles Ballin received a salary from the petitioner of $20,000 per year. Neither Howard Gilman nor Charles Ballin was a shareholder in the petitioner corporation. Up to September 24, 1951, dividends of $6 per share were paid in 1951 to holders of petitioner's preferred stock including Charles. Thereafter, also during 1951, a dividend of $22 per share was declared and paid to all shareholders of the preferred stock of the petitioner except to Charles. Charles waived such dividend on his 5,241 shares of preferred stock which amounted to $115,302. The petitioner and its subsidiaries made the following contributions in 1951 to Gilman Foundation, Inc., which had been created in 1945 by Charles and his family for charitable purposes: Date AuthorizedName of Companyby DirectorsDate PaidAmountPrior toGilman Paper Company4-27-513-15-52$190,000St. Marys Kraft Corporation5-17-5110-15-51350,000Kraft Bag Corporation4-27-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,000Cellucord Corporation (The)4-27-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,000$594,000*283 The net sales and net income of the petitioner and its subsidiaries for their taxable years ending in 1951 are as follows: Taxable YearName of CompanyEndedNet SalesNet IncomeGilman Paper Company12-31-51$14,978,674$ 3,650,494St. Marys Kraft Corporation7-31-5117,753,2446,886,871Kraft Bag Corporation4-30-517,142,881565,173Cellucord Corporation (The)4-30-515,328,467535,400St. Marys Railroad Co.12-31-51Not in Evidence254,380Gilman Electric Light & Power Co.12-31-519,6866,262$45,212,954$11,898,580The petitioner's net income for the years 1930 through 1950 as reported on its income tax returns, as modified by the internal revenue service, was as follows: Net IncomeYear(loss)1930$ 34,15619312,4761932(13,200)1933(169,959)19347,3961935102,7761936229,5671937133,4691938$ 144,1211939122,3521940(79,031)1941116,5181942151,3241943582,1861944734,7461945454,1831946760,49719474,284,52919481,863,5621949885,72819501,805,424Petitioner's net sales in the taxable year 1944 were $7,795,619. During World War*284 II, the production of paper products, including petitioner's, was restricted and the prices of such paper products were frozen at low levels. After World War II, there were increases in the price of paper products. The paper industry, including petitioner, is a growth industry and the rate of growth can be measured by per capita consumption, sales or tons produced. The following table shows the amounts deducted by petitioner as Charles Gilman's compensation for part-time employment and the amounts reported by Charles as received from petitioner from 1949 through 1952: Amount DeductedAmount ReportedYearby Petitionerby Charles Gilman1949$ 71,044$100,0001950110,00095,0441951250,000336,000195272,2190Of the $250,000 deducted by petitioner with respect to Charles Gilman's 1951 compensation, the respondent disallowed the excess over $110,000 as unreasonable and as not being in fact a payment for services. The compensation in excess of $110,000 in 1951 was unreasonable. Opinion The challenged deduction was claimed by the petitioner under section 23(a)(1)(A) of the Internal Revenue Code of 1939 which provides as follows: "SEC. *285 23. DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: "(a) Expenses. - (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *" What constitutes reasonable compensation under section 23(a)(1)(A) is a factual question and is to be determined by the facts and circumstances in each case. Miller Mfg. Co. v. Commissioner, 149 F. 2d 421 (C.A. 4, 1945), affirming a Memorandum Opinion of this Court dated August 22, 1944 [3 TCM 888]. The burden of proving reasonableness is upon the petitioner. Botany Mills v. United States, 278 U.S. 282 (1929). The regulations issued under section 23(a)(1)(A), applicable to the year 1951, provide as follows: "Regulations 111, Sec. 29.23(a)-6. Compensation for Personal Services. - Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other*286 compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. This test and its practical application may be further stated and illustrated as follows: "(1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. (a) An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stock holdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. (b) An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. *287 In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business. "(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. "(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation*288 is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned." The petitioner contends, first, that the compensation paid by it to Charles in 1951 was paid pursuant to a contingent compensation agreement, that the latter had been entered into at arm's-length, that, pursuant to the regulations quoted above, the circumstances which existed on June 22, 1940 (the date of the purported agreement), are those which must be taken into consideration in judging the reasonableness of the 1951 compensation, and, finally, that the compensation was reasonable when judged by such a standard. In support of the latter conclusion, petitioner maintains that the circumstances existing at the time of the 1940 agreement justified the petitioner in believing that the compensation arrangement would not result in substantial future cost to it, and that, at the time it was entered into, the arrangement promised little, if any, financial profit to Charles. There are several*289 defects in the petitioner's reasoning in this regard. The 1940 agreement was between a wholly-owned family corporation, Isaac Gilman, and his only son, Charles. At that time, Isaac owned 60 per cent of petitioner's stock. Charles owned 20 per cent and had been in the business with his father since 1917. The evidence that the agreement was made at arm's-length is unconvincing. The only evidence in this regard was the testimony of Charles and that of Alfred Levy who drew up the agreement and who was then and still is an attorney for petitioner. The evidence so submitted establishes at best that Charles was anxious to guarantee his own control of petitioner upon his father's death and that Isaac was anxious to safeguard the minority interest of his daughters after his death. The latter objective was achieved by placing a limitation upon the maximum that Charles could receive as compensation subsequent to his father's death. There is no evidence of how that amount was arrived at. Fundamentally, however, the 1940 agreement did not constitute a contingent compensation agreement such as is referred to in the regulations. It did not attempt to fix the rate of compensation of Charles to take*290 effect either then or subsequent to Isaac's death. By the plain words of the agreement it purports to do nothing more than fix a limit above which any compensation paid by petitioner to Charles would be received by him as a trustee for the benefit of all stockholders. The agreement clearly does not provide that Charles was in all events to be paid that maximum nor does it in fact fix any amount, up to the maximum, which was to be paid. Under these facts, we do not consider the 1940 agreement to be a true contingent compensation agreement. The first arrangement which can be considered a contingent compensation agreement was the action of petitioner's directors on October 5, 1945, when they adopted the salary resolution set forth in our findings of fact. The salary arrangement then arrived at differed from that set out as a maximum in the 1940 agreement in that the latter referred to ten per cent of petitioner's net profits in excess of $200,000 "as computed for federal income taxes," while the 1945 resolution refers to the $200,000 "as reported * * * before deduction of the amount of compensation to be paid and before provision for Federal Income Taxes." If we extend petitioner's*291 contingent compensation argument to the salary arrangement made in 1945, the petitioner has failed utterly to establish that the latter was an arm's-length agreement. We know nothing whatsoever of the considerations surrounding the level of compensation actually adopted. The only material fact of record respecting its adoption is the bare action of the board of directors. It is true that Charles did not vote on the resolution. However, he called the meeting for the express purpose of considering his own salary; he presided at the meeting; he described the 1940 agreement. One of the two voting directors was Charles Ballin, Charles' brother-in-law, who petitioner maintains was the representative of the minority stock interests (all of whom were close relatives). However, Ballin did not testify, nor did the other director, nor did any of the minority stockholders. In actual fact, Charles' 1951 salary was not based upon a purported contingent compensation agreement at all. If he had been paid in 1951 on the basis of the maximum set in the 1940 agreement, he would have been paid approximately $336,000. If he had been paid on the basis of the 1945 resolution, he would have been paid about*292 $370,000. He was actually paid only $250,000 with respect to 1951 services. When asked by respondent's counsel at the trial why he took a $250,000 salary in 1951, Charles replied, with appealing frankness, "Because I needed it to live on." As set out in our findings, the compensation accrued by petitioner in the years 1949-1952, inclusive, as compensation for Charles' services, differ substantially from the amounts reported by him as having been in fact received. Such evidence as there is establishes simply that Charles' actual compensation was fixed, not on the basis of a bona fide contingent compensation agreement, but simply from time to time primarily as his own needs dictated. However, it is clear from the statute, as well as the regulations, that, whether or not the compensation in question was paid pursuant to a bona fide, arm's-length contingent compensation agreement (which we have held it was not), the crux of the issue remains the reasonableness of the compensation under all the facts and circumstances. Miller Mfg. Co. v. Commissioner, supra. Most of the evidence submitted by petitioner consisted of the testimony of Charles Gilman himself, and, with respect*293 to the nature and extent of his services to petitioner in 1951, that is the only evidence. Much of Charles' testimony related to the events leading up to the acquisition of the subsidiary operation at St. Mary's, Georgia, prior to his father's death. He testified that it was he that first recognized the importance of expanding the business to include an operation in the South; that his father at first acquiesced in his organizing an independent company to conduct such operations; and that his father then decided to finance and organize the St. Mary's operation as a subsidiary of petitioner. Charles' testimony and that of the attorney, Levy, as to the part played by Charles in setting up the St. Mary's operation were too fragmentary to provide any basis for an appraisal of Charles' qualifications in the paper business or of his contributions to the business of petitioner. For example, Levy testified that Charles "attended to" the construction of the St. Mary's plant in late 1940. The record then shows the following on direct examination: "Q. To your knowledge, did Charles Gilman have any experience in constructing mills? "A. Yes, lots of it. "Q. Where and when? "A. Up to Gilman, *294 Vermont, where they fixed a paper machine up there. He had all the conferences with the engineers." In any event, Charles' activities with respect to the organization of the St. Mary's operation and construction of the facilities there in 1940 are without evidentiary value in determining reasonableness of the 1951 compensation. No evidence was offered of the prevailing compensation paid to employees performing similar services in other comparable enterprises, a factor often considered in like cases. Miller Mfg. Co. v. Commissioner, supra; Ecco High Frequency Corp. v. Commissioner, 167 F. 2d 583 (C.A. 2, 1948), affirming a Memorandum Opinion of this Court dated August 7, 1946 [5 TCM 688]; Miles-Conley Co. v. Commissioner, 173 F. 2d 958 (C.A. 4, 1949), affirming 10 T.C. 754 (1948). The evidence of Charles' actual services is sparse and dependent upon his own testimony. The petitioner's 1951 return labels his services as "part-time." Charles disputed this characterization but there is, in fact, no evidence of how much actual time he did devote to the business of that petitioner. Indeed, other than such statements*295 as that he ran the business "from top to bottom," there is no persuasive evidence of the services performed by Charles for petitioner. His testimony in this regard was vague and in the form of generalities. No other officer or employee of petitioner testified as to the nature and extent of Charles' services. There is evidence of increased earnings and dollar sales of petitioner subsequent to Isaac's death and through 1951. We know both that the paper industry was a growth industry and that there were price increases in the industry following World War II. Whether petitioner's growth in earnings and dollar sales were above the industry average, we do not know. The extent to which increased dollar sales reflected increased sales in tons (or in other appropriate units), we do not know. Finally, if there was an above-average expansion in petitioner's business, we do not know to what extent and in what manner Charles was responsible. Charles had no unusual educational qualifications. Our observation of him during his rather extensive testimony impressed us with the fact that, rather than possessing any special qualifications either with respect to the paper industry generally or the*296 petitioner's operations in particular, Charles Gilman was an agreeable but entirely unexceptional individual. Indeed, while we accept the fact that he has been associated with petitioner since 1917, little, if any, of his testimony disclosed a familiarity with the paper industry or a grasp of technical aspects of that industry, or of the petitioner's business, which might not be the common knowledge of any reasonably informed individual. Based upon the entire record, we have found as a fact that the compensation deducted by petitioner in 1951 with respect to the services in that year of Charles Gilman was unreasonable to the extent that it exceeded $110,000. We have found that in 1951 Charles "waived" a preferred stock dividend which, in his case, amounted to $115,302. He testified that he was anxious that every dollar be kept in the business that could. In the same year, the petitioner made a contribution of $190,000 to a family foundation and Charles received $336,000 purportedly as compensation for his services in 1951 and prior thereto. Under the circumstances, the record amply sustains the respondent's further determination that the disallowed salary payment was, in fact, *297 a disguised dividend. The determination of the respondent is sustained. Decision will be entered for the respondent. Footnotes*. $86,000 of the $336,000 was for services prior to 1951. Charles also operated a farm in the taxable year 1951 from which he reported an $11,259.97 loss.↩