ESTATE OF CHARLES GILMAN, DECEASED, HOWARD GILMAN, CHARLES GILMAN, JR., AND SYLVIA P. GILMAN, EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2730-72.     Filed November 10, 1975.

*James B. Lewis* and *Maurice Austin,* for the petitioners.
*Agatha L. Vorsanger,* for the respondent.

302

304

OPINION

Under section 2036(a),[2] property transferred by a decedent is

---

[2] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

included in his gross estate if, under the transfer, the decedent retained for his life or a period which did not in fact end before his death (1) the "enjoyment" of the property or (2) the right, either alone or in conjunction with any person, to designate the persons who shall enjoy the property or the income therefrom. Respondent relies upon these provisions to include the transferred Gilman Paper stock in decedent's gross estate.[3]

Section 2036(a) reflects a "legislative policy of subjecting to tax all property which has been the subject of an incomplete *inter vivos* transfer." *United States v. O'Malley,* 383 U.S. 627, 631 (1966). The policy is to include in a decedent's gross estate transfers which are in substance testamentary, i.e., "transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." *United States v. Estate of Grace,* 395 U.S. 316, 320 (1969).

As stated in *Commissioner v. Estate of Church,* 335 U.S. 632, 645 (1949):

an estate tax cannot be avoided by any trust transfer except by a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property.

At the center of the present controversy is *United States v. Byrum,* 408 U.S. 125 (1972), the most recent Supreme Court pronouncement on the breadth and reach of section 2036(a). In that case, Byrum transferred stock in three unlisted corporations, in which he was the majority stockholder, to an irrevocable trust for the benefit of his children. He retained the right to vote the transferred stock, to veto any transfer by the trustee (a bank) of any stock, and to remove the trustee and appoint another corporate trustee as successor. The retained right to vote the transferred stock, together with the vote of the stock decedent owned at the time of his death, gave him a majority vote in each of the corporations. The Supreme Court held that the rights the decedent reserved in respect of the transferred stock did not constitute retained enjoyment thereof or the right to designate the

---

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[3] Sec. 2036(a) also applies where the decedent, under the transfer, retains "possession" of the property or the "right to the income" from the property. Respondent does not rely upon those provisions. Respondent has also waived reliance on sec. 2038, which was referred to in the notice of deficiency.

person or persons who would enjoy the income therefrom, stating, inter alia, that (408 U.S. at 149):

The statutory language [of sec. 2036(a)] plainly contemplates retention of an attribute of the property transferred—such as a right to income, use of the property itself, or a power of appointment with respect either to income or principal.

Even if Byrum had transferred a majority of the stock, but had retained voting control, he would not have retained "substantial present economic benefit," * * * [Fn. ref. omitted.]

In support of its conclusion, the Court repeatedly emphasized the fiduciary duty of a majority shareholder not to misuse his power by promoting his personal interests at the expense of corporate interests and the fiduciary duty of the directors of a corporation not to play favorites among the shareholders but to promote the interests of the corporation as a whole. These duties so qualified the retained rights of the decedent that, the Court held, they were insufficient to cause inclusion of the stock in decedent's gross estate under section 2036(a).

Petitioners contend that the *Byrum* case is dispositive of the instant one. Respondent seeks to distinguish the case on its facts. There are factual differences between the two cases, but we think that most of those differences add strength to petitioners' case. We hold that decedent's June 30, 1948, transfer of the Gilman Paper common stock in trust was a completed one and that the value of the stock is not includable in his gross estate.

### 1. *Retention of Enjoyment*

The Gilman Paper Co. stock may not be included in decedent's gross estate under the portion of section 2036(a)(1) relied upon by respondent—that decedent retained the "enjoyment" of the stock—for two closely related reasons: (1) Decedent did not retain enjoyment of the stock "under" the transfer; and (2) the rights that he retained with respect to the stock did not constitute "enjoyment" within the meaning of that term as it is used in section 2036(a)(1).

Section 2036(a)(1) applies only where the decedent has "retained" enjoyment "under" the "transfer." This means that the enjoyment of the transferred property must be reserved "in connection with or as an incident to the transfer." *McNichol's Estate v. Commissioner,* 265 F.2d 667, 670 (3d Cir. 1959), affg. 29 T.C. 1179 (1958), cert. denied 361 U.S. 829 (1959). The

section applies only where a prearrangement, embodied in an express or implied agreement, permits the transferor to enjoy the benefits of the property or its income. *Estate of Roy D. Barlow,* 55 T.C. 666, 670 (1971); *Estate of Harry H. Beckwith,* 55 T.C. 242, 247 (1970); Stephens, Maxfield, & Lind, Federal Estate and Gift Taxation, pp. 4-81—4-83 (3d ed. 1974); see also *Fabian v. United States,* 127 F.Supp. 726, 728 (D. Conn. 1954). Thus, for example, the section does not apply where a husband transfers his interest in a residence to his wife and they continue to occupy it as the family home unless, by agreement, he reserves the right of occupancy as an incident to the transfer. *Union Planters National Bank v. United States,* 361 F.2d 662 (6th Cir. 1966); *Estate of Binkley v. United States,* 358 F.2d 639 (3d Cir. 1966); *Estate of Allen D. Gutchess,* 46 T.C. 554 (1966); *Estate of Robert W. Wier,* 17 T.C. 409, 422 (1951); *Stephenson v. United States,* 238 F.Supp. 660 (W.D. Va. 1965); compare *Estate of Emil Linderme, Sr.,* 52 T.C. 305 (1969).

The inquiry must be focused, therefore, on the agreements made by the parties on June 30, 1948, when the decedent's Gilman Paper common stock was transferred to the trust. The question is whether there was an express or implied agreement at the time of the transfer that decedent would continue to enjoy that stock or that the right to enjoy the stock would later be conferred upon him.[4] The evidence relating to events subsequent to the transfer is relevant only to the extent that it helps answer that question.

In analyzing the evidence on that crucial question, it is important that the term "enjoyment" refers to the economic benefits obtainable from the transferred property. As stated in *United States v. Byrum,* 408 U.S. at 147, the term is "used to deal with situations in which the owner of property divested himself of title but retained an income interest or, in the case of real property, the lifetime use of the property." "Enjoyment as used in the death tax statute is not a term of art, but is synonymous with substantial present economic benefit." *McNichol's Estate v. Commissioner,* 265 F.2d at 671; see also

---

[4] Sec. 20.2036-1(a)(ii), Estate Tax Regs., provides:

An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred.

See *Skinner's Estate v. United States,* 316 F.2d 517 (3d Cir. 1963).

*Commissioner v. Estate of Holmes,* 326 U.S. 480, 486 (1946); *Commissioner v. Estate of Church,* 335 U.S. at 645.[5]

A. *The terms of the June 30, 1948, transfer in trust.*—The transfer under the agreement of June 30, 1948, whereby decedent placed his Gilman Paper common stock in trust, was not qualified in any way. Under that agreement, decedent transferred the stock irrevocably to himself, his son, Howard, and his attorney, I. Alfred Levy, as trustees. The income of the trust was payable to decedent's two sons for life, with the remainder to their issue. All acts and decisions of the trustees were to be by a majority vote. The trustees undertook to execute the agreement "with all due fidelity and [to] account for all the moneys and things received by them hereunder to the beneficiaries." In his individual capacity, decedent retained certain powers—e.g., to appoint a successor trustee in case one of the other trustees should resign, die, or otherwise be unable to continue to serve, and, with the approval of the other trustees, to amend the administrative provisions of the instrument. But none of the powers expressly retained are sufficient to constitute enjoyment of the stock within the meaning of section 2036(a)(1), and we do not understand respondent to contend otherwise.

B. *"Control" of the corporation.*—Respondent contends that the only reason for the existence of the transferred stock was the right of its owner to "control" the destiny of Gilman Paper. Respondent argues that the agreement creating the trust was so structured as to enable decedent to continue to "control" the corporation and the transfer, therefore, was not a completed one.[6] In making this argument, respondent in effect throws an

---

[5] Sec. 20.2036-1(b)(2), Estate Tax Regs., provides:

The "use, possession, right to the income or other enjoyment of the transferred property" is considered as having been retained by or reserved to the decedent to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his *pecuniary benefit.* [Emphasis added.]

[6] Respondent never actually tells us what he means by "control." In *United States v. Byrum,* 408 U.S. 125, 137 n. 10 (1972), the Supreme Court stated its concern with the vagueness of the term "control":

"The 'control' rationale, urged by the Government and adopted by the dissenting opinion, would create a standard—not specified in the statute—so vague and amorphous as to be impossible of ascertainment in many instances. See n. 13, *infra.* Neither the Government nor the dissent sheds light on the absence of an ascertainable standard. * * *"

The Court added (408 U.S. at 138 n. 13):

"The Government uses the terms 'control' and 'controlling stockholder' as if they were words of art with a fixed and ascertainable meaning. In fact, the concept of 'control' is a nebulous one. * * *"

umbrella over all that decedent did and might have done as trustee, director, and chief executive officer, and maintains that all those actions and possible actions, viewed in their totality, show that decedent retained the enjoyment of the stock. We do not agree.

Gilman Paper's stock structure in 1948—only 10 shares of common and nearly 10,000 shares of preferred stock—was highly unusual, but the practical and legal effect of the transfer would have been the same if the voting, dividend, and liquidation rights of the 10 common shares had been scattered among 10,000 common shares. Since respondent has valued the common shares at $24,500,000, respondent cannot be heard to say they were without independent value. Nor does it matter that Isaac Gilman's objective in so structuring the corporation's stock, and decedent's purpose in creating the trust, was to keep the voting control of Gilman Paper in the Gilman family. The applicability of section 2036(a) turns not on the settlor's motives in creating the trust, but on the nature and operative effect of the trust transfer.[7]

In terms of the operation and effect of decedent's June 30, 1948, transfer, we do not think decedent had such control over Gilman Paper as to give him a substantial present economic benefit. Respondent at least implicitly concedes that managerial and administrative powers vested in a settlor-trustee, including the right to vote stock held in the trust estate, do not trigger the applicability of section 2036(a). *Old Colony Trust Co. v. United States*, 423 F.2d 601, 602 (1st Cir. 1970);[8] *Estate of Edward E.*

---

[7] In *United States v. Estate of Grace*, 395 U.S. 316, 323 (1969), the Supreme Court said:

"Emphasis on the subjective intent of the parties in creating the trusts, particularly when those parties are members of the same family unit, creates substantial obstacles to the proper application of the federal estate tax laws. As this Court said in Estate of Spiegel v. Commissioner of Internal Revenue, 335 U.S. 701, 705-706, 69 S.Ct. 301, 303, 93 L.Ed. 330 (1949):

'Any requirement * * * [of] a post-death attempt to probe the settlor's thoughts in regard to the transfer, would partially impair the effectiveness of * * * [sec. 811(c)] as an instrument to frustrate estate tax evasions.'

"We agree that 'the taxability of a trust corpus * * * does not hinge on a settlor's motives, but depends on the nature and operative effect of the trust transfer.' *Id.,* at 705, 69 S.Ct., at 303. See also Commissioner v. Estate of Church, *supra.*"

[8] In *Old Colony Trust Co. v. United States*, 423 F.2d 601, 602 (1st Cir. 1970), the court said:

"It is common ground that a settlor will not find the corpus of the trust included in his estate merely because he named himself a trustee. Jennings v. Smith, 2 Cir., 1947, 161 F.2d 74. He must have reserved a power to himself that is inconsistent with the full termination of ownership. The government's brief defines this as 'sufficient dominion and control until his death.' Trustee powers given for the administration or management of the

*Ford,* 53 T.C. 114,.127-129 (1969), affd. per curiam 450 F.2d 878 (2d Cir. 1971); *Estate of Willard V. King,* 37 T.C. 973, 978 (1962). Insofar as the voting of stock entails the control of a corporation, the Supreme Court in *United States v. Byrum,* 408 U.S. at 150, held that retention by a decedent *in his individual capacity* of voting control of a corporation "was not the retention of the enjoyment of the transferred property within the meaning of the statute." Surely, then, the retention by decedent of the right *in his capacity as a trustee* to cast one of three votes as to how the stock should be voted does not constitute retention of the enjoyment of the property.[9]

It is true, as emphasized by respondent, that the Court in *United States v. Byrum, supra* at 150, pointed out that there were "unrelated minority interests" who could see that Byrum and the other officers did not violate their fiduciary duty to all of the stockholders. But the express trust created by decedent constrained him from using his influence on the voting of the Gilman Paper common stock for his personal economic benefit. Moreover, the plain fact is that when the June 30, 1948, trust agreement was signed, decedent's four sisters owned 40 percent of the common and 47 percent of the preferred stock.[10] The sisters' interests and those of their husbands were decidedly adverse to those of decedent or the trust. Indeed, one of the main reasons for Isaac Gilman's 1940 agreement with decedent was to avoid conflicts between his sons-in-law and decedent which would

---

trust must be equitably exercised, however, for the benefit of the trust as a whole. * * * [Fn. ref. omitted.]"

[9] The extent of the fiduciary duties of a trustee who directs the operations of a corporation was defined as follows in *In Re Hubbell's Will,* 302 N.Y. 246, 254, 97 N.E.2d 888, 891 (1951):

"Where * * * the trustees own, in their individual and representative capacities, the entire outstanding stock of a corporation, * * * [the fiduciary] duty extends not only to the trust estate as such but also to the operations of the corporation. * * * 'It is well established that where a trustee holds a working control of the stock in an estate corporation * * * [h]is cestuis que trustent may require him to treat the corporate transactions as though they were his own transactions as trustee * * *' [Citations omitted.]"

[10] These percentages are considerably greater than in *United States v. Byrum, supra,* where the minority shareholders held 29 percent, 17 percent, and 12 percent of the stock in the three corporations there involved. Under the law of New Hampshire, where Gilman Paper was incorporated, the approval of two-thirds of all shareholders is required for many actions, including mergers, consolidations, major recapitalizations, and the sale, lease, or exchange of all its assets. N.H. Rev. Stat. Ann. secs. 294:40, 294:41 (1966). Thus, contrary to one of respondent's arguments, the trust did not own sufficient shares to take these actions.

adversely affect the company.[11] Also, the remaindermen of the trust, decedent's grandchildren, represented another adverse interest.

The adverse interests of decedent's sisters were terminated in 1957, when the corporation purchased their shares, but there is no evidence of an express or implied agreement in 1948, when the trust was created, that the sisters would sell their common and preferred shares. The inference is to the contrary. The relevant corporate minutes indicate that negotiations to that end were not begun until a short time before January 1957; that relationships within the family were not harmonious; and that a controversy over the transaction persisted even after the sale was completed. Thus, the 1948 transfer in trust left the Gilman sisters with a substantial block of the Gilman Paper stock and their interests were adverse to those of both the trust and decedent.

Similar practical constraints effectively denied decedent unimpeded control of the board of directors. The bylaws of Gilman Paper, in accordance with State law, provided that the board of directors shall be elected annually. A majority vote of the trustees, who voted all the common stock, was required for election, and from 1948 to 1957 the board always included Charles Ballin, decedent's brother-in-law. The minutes describe him as a representative or spokesman for the "other shareholders." On three occasions (in 1951, 1953, and 1954), Ballin and Howard Gilman outvoted decedent and declared dividends over decedent's strong opposition. I. Alfred Levy's testimony describes other instances in which Ballin and Howard Gilman were able to persuade decedent to retreat from an initially taken position and agree with them. Thus, as a matter of fact, the record shows that decedent did not dominate the board. Moreover, as a matter of law, the trustees in selecting directors and the directors in managing the corporation were restrained by their fiduciary duties and obligations to the corporation and all its shareholders. See *United States v. Byrum,* 408 U.S. at 138.

---

[11] I. Alfred Levy, the attorney who drafted the 1940 agreement, testified:

"it was Mr. Isaac Gilman's desire to have this company remain in the hands of the family as long as they could and * * * he didn't want his in-law's sons [sic] to fight and disturb the company so he, in his wisdom, decided that he—wanted Charles Gilman who, incidentally, knew more about the paper industry and paper business than any of the others, he wanted him to have control—not control of the company—but to have—be in a position to run it and operate it without interference by the in-laws who were also working with the company * * *"

C. *Decedent's employment as chief executive.*—As to decedent's executive position with the company, no doubt he, as well as the other two trustees, anticipated at the time the trust was created that decedent would continue to serve as the chief executive officer of Gilman Paper. The company was experiencing dramatic growth, and a corporate executive who is making money for his employer usually keeps his job. But decedent did not reserve the right to remain as chief executive of the company. Indeed, the direct testimony, elicited by respondent, is that there was no express or implied agreement that he would continue to serve,[12] and Levy further testified that "we could have thrown him out." The mere "probability of continued employment and compensation" does not constitute "the substantial 'enjoyment of * * * [the transferred] property' within the meaning of the statute." *United States v. Byrum, supra* at 150; see also *Estate of William F. Hofford,* 4 T.C. 790, 794 (1945).

Respondent attempts to demonstrate that decedent's continued employment enabled him to benefit himself economically in other ways, citing the decision of this Court that in 1951 decedent's salary was excessive. *Gilman Paper Co.,* T.C. Memo. 1960-13, affd. 284 F.2d 697 (2d Cir. 1960).[13] For that year, decedent drew a salary of $250,000 from Gilman Paper, compared with $110,000 for the immediately preceding year and compared with the compensation of $370,000 he could have drawn under the October 5, 1945, resolution of the board of directors. This Court sustained the Commissioner's determination that all except $110,000 of the $250,000 salary exceeded the "reasonable compensation" allowable as a deduction by section 23(a), I.R.C. 1939.

---

[12] Levy was called as a witness by respondent and testified as follows with respect to the creation of the trust:

Q. To your knowledge, sir, were there any agreements either expressed or implied, that Mr. Gilman would continue in the same General Manager and executive of the company?

A. There never was any agreement. The question never came up. There never was any discussion about Charles Gilman's leaving or staying or Charles Gilman's authority or anything.

[13] Beginning in 1955, the year before the notice of deficiency in that case was issued, and continuing through 1964, decedent's salary in no year exceeded $110,000, thus confirming the Supreme Court's view in *United States v. Byrum, supra* at 150, that the Commissioner's disallowance of deductions for unreasonable compensation paid to corporate executives serves as a deterrent in cases where the settlor of a trust of stock of a corporation remains an employee.

Gilman Paper contended in that case that decedent's salary was paid pursuant to a contingent compensation contract embodied in the June 22, 1940, agreement with Isaac Gilman and the 1945 resolution of Gilman Paper's board of directors. This Court held that the June 22, 1940, agreement was not a contingent compensation agreement but merely fixed a limitation on the amount payable as compensation. As to the corporate resolution, there was no showing that it reflected arm's-length bargaining, the "only material fact of record respecting its adoption" being "the bare action of the board of directors." Otherwise, the Court's opinion is based largely upon a failure of proof, but one crucial factor was that decedent "waived" a preferred stock dividend of $115,302 in that year. This Court concluded that the "disallowed salary payment was, in fact, a disguised dividend." [14]

Respondent claims that this Court's opinion shows that decedent was able to exploit the corporation at will and that the failure of the corporation to seek reimbursement of the excessive portion shows that the exploitation was consistently unopposed or unrestrained. We think respondent tries to squeeze entirely too much from that opinion. The Commissioner challenged the reasonableness of decedent's salary in only 1 of the 20 years following the creation of the trust. The Court stated that decedent's salary was fixed "from time to time primarily as his own needs dictated," but that statement was part of the Court's rejection of Gilman Paper's contingent compensation argument, not a holding that decedent did or could pillage the assets of the corporation. As far as we can tell, he never drew more as a salary than the amount to which he was entitled under the 1945 resolution. Thus, the excessive salary in 1951, if it was excessive

---

[14] The minutes of the special meeting of the board of directors of Sept. 24, 1951, state that decedent vigorously opposed payment of the 1951 dividend, pointing to corporate needs for the funds and stating that he would not accept it. Nonetheless, the other directors authorized the dividend by a vote of 2 to 1, thus documenting petitioner's contention that decedent lacked a controlling voice in corporate affairs. The minutes of that meeting contain the following:

"Mr. Ballin [one of decedent's brothers-in-law] continued the discussion and suggested that if the Chairman [decedent] as shareholder does not want the declaration and payment of dividends on his stock that that is his business, but the other shareholders have asked him to bring the question before the Board and he as director believes that the shareholders should be given an additional dividend at this time, despite the advice of the Chairman and regardless of how the Chairman felt."

A motion was then made and adopted by a vote of 2 to 1, calling for a dividend of $22 per share. As noted previously, decedent's views on the declaration of dividends also failed to prevail in 1953 and 1954.

by business standards, was aberrational and does not support respondent's argument.

True, after the 1960 decision of the Court of Appeals, the corporation and the trustees did not seek to recoup the allegedly excessive salary paid decedent in 1951. But their failure to compel decedent to restore the amounts determined to have been excessive does not show decedent retained the right to a present economic benefit from the transferred stock. Petitioners' reply brief provides this effective answer to respondent's argument:

> In asserting that the decedent should have been asked to repay the $140,000 disallowed as a deduction, the Commissioner has misunderstood the significance of the facts. The decedent waived a 1951 dividend and received increased 1951 compensation. The Treasury, understandably, complained that, by attempting to disguise a dividend as compensation, the corporation was seeking an unauthorized deduction. However, that attempt was not unfair to stockholders; to the contrary, transmutation of a dividend into deductible compensation can only benefit the corporation and, therefore, its stockholders. Such an attempt, successful or otherwise, is not unfair to stockholders. What the decedent had accepted with one hand he had relinquished with the other.

Gilman Paper's failure of proof in this Court would not have aided it, with the tables turned, in proving a claim for recoupment against decedent. Its claim would have been faced with the 1945 resolution under which decedent was entitled to a salary of $370,000 and with the dramatic financial success of the corporation under his executive leadership.

Finally, the testimony included in the record of that case [15] must be read in its context in the light of the issue being litigated. Some of that testimony, relied upon most heavily by respondent, was evidently discounted or disbelieved by the trial judge who heard it.[16]

---

[15] The parties stipulated: "A copy of the record on appeal [of the Tax Court reasonable compensation case] is annexed hereto as Joint Exhibit 23-W." Rule 91(c) of the Rules of Practice and Procedure of this Court provides that: "A stipulation when filed need not be offered formally to be considered in evidence." While the stipulation does not state what probative effect is to be given to the contents of that record, we do not interpret the stipulation to mean that the parties agree to the truthfulness of all statements in that record. We understand that it is to be weighed, in context, along with all the other evidence.

[16] As to decedent's statement at that trial that he ran the business "from top to bottom," repeatedly referred to by respondent, the trial judge wrote (*Gilman Paper Co.*, T.C. Memo. 1960-13):

"The evidence of Charles' actual services is sparse and dependent upon his own testimony. The petitioner's 1951 return labels his services as 'part-time.' Charles disputed this characterization but there is, in fact, no evidence of how much actual time he did devote to the business of the petitioner. Indeed, other than such statements as that he ran the business 'from top to bottom,' there is no persuasive evidence of the services performed

D. *The 1965, 1966, and 1967 accumulated earnings tax.*—Our Findings describe the Commissioner's determinations, made after decedent's death, of accumulated earnings tax liabilities for 1965, 1966, and 1967. Respondent cites the failure of anyone on behalf of Gilman Paper or the trust to recoup the accumulated earnings tax from decedent's estate as evidence that nothing and no one restrained decedent's activities with respect to the company.

For 1965, since the matter was settled without any liability, no claim could have been asserted against decedent. Since decedent died on June 19, 1967, he could hardly be charged with the responsibility for the corporation's failure to distribute a larger portion of its earnings for that year. Indeed, the assertion of the liability for 1967 indicates that decedent was not responsible for Gilman Paper's conservative dividend policy since that policy was continued after his death. Settlement of the 1966 claim for only about 22 percent thereof, nearly 4 years after decedent died, suggests that the Commissioner regarded his claim as a weak one.

A recoupment claim for an accumulated earnings tax is a highly unusual one.[17] Of necessity, such a claim would take the form of a stockholder's derivative suit and would challenge the action of the board of directors in failing to declare adequate dividends. The amount recoverable by the stockholders who might have sued decedent's estate (the trust, the foundation, and Charles Gilman, Jr.) was too small to justify the expense of litigation. Since the corporate minutes do not reflect that the other directors made any effort to change the corporation's conservative dividend policy (except in 1951, 1953, and 1954, when they outvoted decedent), they would be liable, as a matter

by Charles for petitioner. His testimony in this regard was vague and in the form of generalities. No other officer or employee of petitioner testified as to the nature and extent of Charles' services."

Instead of finding that decedent was the domineering personality the respondent here contends that he was, the trial judge found that "Charles Gilman was an agreeable but entirely unexceptional individual." Our search of that record discloses nothing basically inconsistent with the testimony in the present case. We find nothing in that record, read in context, which supports an inference that decedent retained the right to any economic benefit from the transferred stock.

[17] The only case cited by the parties (and we have located none other) is *Mahler v. Trico Products Corp.,* 296 N.Y. 902, 72 N.E.2d 622 (1947), stemming from *Trico Products Corp. v. Commissioner,* 137 F.2d 424 (2d Cir. 1943), cert. denied 320 U.S. 799 (1943), and *Trico Products Corp. v. McGowan,* 169 F.2d 343 (2d Cir. 1948), cert. denied 335 U.S. 899 (1948). As far as we can tell, that case was not litigated to a conclusion.

of law, equally with decedent. We can find no ground, as a practical matter, for holding that decedent retained the enjoyment of the stock in any of the facts relating to the corporation's failure to assert against decedent's estate a claim for the restoration of the 1966 accumulated earnings tax.

## 2. *Retention of the Right to Designate the Recipient of the Property or the Income Therefrom under Section 2036(a)(2)*

Respondent's second contention is that decedent retained the "right," either alone or in conjunction with other persons, to designate the persons who shall enjoy the property or the income therefrom. In making this argument, respondent again ignores the language of the statute and the terms of the trust and lumps decedent's powers as trustee with his powers as a director and as chief executive officer. He argues: "The decedent in conjunction with another trustee, had the right to vote the shares and select the corporate directors and thereby control the dividend policy of Gilman." In this connection, respondent points out that the trust instrument required the trustee to distribute its income currently and argues that, consequently, the power to declare dividends enabled decedent to regulate "not only the flow of income to the trust, but also the flow of income from the trust to the beneficiaries."

Section 2036(a)(2) is cast in the terms of a retained "right." As explained in *United States v. Byrum,* 408 U.S. at 136-137, in rejecting a similar argument:

The term "right," certainly when used in a tax statute, must be given its normal and customary meaning. It connotes an ascertainable and legally enforceable power * * *. Here, the right ascribed to Byrum was the power to use his majority position and influence over the corporate directors to "regulate the flow of dividends" to the trust. That "right" was neither ascertainable nor legally enforceable and hence was not a right in any normal sense of that term.

The Court added (408 U.S. at 137): "The power to elect the directors conferred no legal right to command them to pay or not to pay dividends." The Court rejected the Government's argument that Byrum's de facto powers, as distinguished from his legal rights, placed the entrusted stock within the reach of section 2036(a)(2) stating (408 U.S. at 138, 142-143):

The Government seeks to equate the *de facto* position of a controlling stockholder with the legally enforceable "right" specified by the statute. * * * * * *

Byrum was * * * inhibited by a fiduciary duty from abusing his position as majority shareholder for personal or family advantage to the detriment of the corporation or other stockholders. * * *

* * *

We conclude that Byrum did not have an unconstrained *de facto* power to regulate the flow of dividends to the trust, much less the "right" to designate who was to enjoy the income from trust property. * * *

A comparison of the facts of the two cases shows that Byrum had greater power to affect dividend policy than decedent in the instant case. Byrum's powers were held individually while decedent's powers were held in trust. By simply outvoting him in electing the board, decedent's cotrustees could have indirectly thwarted his desires. Similarly, by outvoting him as a member of the board (as it did three times, in 1951, 1953, and 1954), the board could have directly defeated decedent's wishes as to the payment of dividends. Byrum could have removed and replaced a trustee whereas decedent in this case had no such power. Thus, not only were all of decedent's powers fiduciary ones, they were less extensive than those of Byrum.

We conclude that decedent retained neither the enjoyment of the transferred stock within the meaning of section 2036(a)(1) nor the right, alone or in conjunction with others, to designate the person or persons who would enjoy the stock or the income therefrom within the meaning of section 2036(a)(2).

*Decision will be entered for the petitioners.*

Reviewed by the Court.

GOFFE, *J.*, concurring: I agree with the conclusion reached by the majority. The case is controlled by *United States v. Byrum,* 408 U.S. 125 (1972), and this is not the Court to reconsider or rewrite that opinion.

Throughout this litigation, respondent has consistently conceded that the trust created by decedent in 1948 was a valid one. After the transfer to the trust, all powers decedent held with respect to the Gilman Paper common stock were fiduciary powers. If anything is clear from the *Byrum* opinion, it is that the exercise of fiduciary powers to vote the stock of a corporation does not constitute the "enjoyment" of that stock within the meaning of section 2036(a)(1), and it does not matter whether those powers are exercised by a sole trustee, one of three trustees

(as here), or even, as in *Byrum,* one who has transferred his stock to a trust but retained the right in his individual capacity to vote it. The personal satisfactions or the psychic benefits derived from voting the stock do not constitute the kind of retained economic benefits which constitute "enjoyment" within the meaning of section 2036(a)(1).

The dissent scorns the veracity of one of the witnesses. However, after decedent submitted his common stock to the restraints of a fiduciary, he became only one of three trustees in deciding how the stock would be voted. His powers thereafter were subject not only to fiduciary obligations to the other shareholders, whose interests were sharply adverse, but the fiduciary restrictions flowing from the express trust. The corporate bylaws required annual elections of the corporation's directors and the president. The directors were not figureheads. They could have elected someone else as president. Indeed, on three occasions (in 1951, 1953, and 1954), the corporate minutes reflect that the directors outvoted decedent 2 to 1 on the payment of dividends. The testimony of Gilman's attorney that there was no express or implied agreement in 1948 that decedent would continue to serve as president, the only specific testimony on the point, is thus wholly consistent with the undisputed documentary evidence. But it would make no difference, even if there had been an agreement that decedent would be the most influential one of the three trustees, because whatever powers decedent retained were fiduciary ones, and *Byrum* makes it clear that the exercise of fiduciary powers does not constitute enjoyment under section 2036(a)(1).

IRWIN and STERRETT, *JJ.,* agree with this concurring opinion.

RAUM, *J.,* dissenting: I have no doubt on the record before us that the decedent, Charles Gilman, retained until his death the "enjoyment" of the 6 shares of common stock within the meaning of section 2036(a)(1) of the Code. An understanding of the history and significance of these 6 shares is necessary for a proper consideration of the matter.

In late 1939 and early 1940, a serious conflict had developed between Charles Gilman and his father (Isaac Gilman) in respect of the Gilman Paper Co. Only one class of stock was then outstanding, consisting of 25,000 shares of voting common. Isaac

owned nearly 16,000 shares, Charles about 5,000 shares, and Charles' four sisters 1,000 shares each. Isaac, who was then about 75 years old, dominated the company, and Charles, who was then about 42 years old, was the only other member of the family who was engaged to any significant degree in the conduct of the company's business. To the extent that Charles' sisters' husbands were also engaged in the company's affairs they were "there as a sinecure" and added very little to the operation of the enterprise. Charles was fearful that upon his father's death, his 16,000 shares would be divided equally among all five children, with the consequence that Charles, as a minority stockholder, could be ousted from a position of control over the company. He importuned his father for some arrangement that would prevent any such result from occurring. Indeed, when no such arrangement appeared on the horizon, he not only threatened to quit his association with the company, but undertook to implement that threat by carrying on extensive negotiations looking towards the establishment of other business connections for himself. He made it clear to his father that he "wanted first and uppermost to be put in a position where I would run that company, because I felt I was the only one that could run that company—when I say 'run it,' have control of it * * * to control the Gilman Paper Company, should anything happen to him." [1]

The solution to the problem was finally found in an agreement dated June 22, 1940, which provided for the reorganization of the company, whereby the entire outstanding 25,000 shares of voting common were exchanged for 25,000 shares of new nonvoting preferred, and the control of the company was concentrated in 10 new shares of $100 par value voting common, of which 6 shares were issued to Isaac and 4 to Charles. The agreement also provided that on Isaac's death, Charles was to have the right to purchase 2 shares of the new common from his father's estate at par, upon condition, however, that Charles enter into a further agreement with the company that his compensation would not exceed an amount determined in accordance with a certain formula. Under conditions which then prevailed, that formula placed an effective ceiling of $30,000 a

---

[1] The quotation is from Charles' testimony in *Gilman Paper Co.,* 19 T.C.M. 81, affirmed 284 F. 2d 697 (2d Cir.), the entire record of which was made a part of the record in the present case. I do not understand that petitioners question the truthfulness of this testimony or of his statement appearing *infra,* which is also taken from that source.

year on Charles' salary, in contrast to the $40,000 that he was then receiving from the company and its affiliates. Distasteful as these latter provisions were to Charles, he was nevertheless willing to accept these terms because—

I had one idea in mind, which was uppermost in my mind, and that was, as I explained before, the control of the business after my father died, that I would be assured of the control of the business, and when I accomplished that, or if I could accomplish that, that meant to me more than salary or anything else.[2]

Upon Isaac's death in 1944, Charles exercised his right to purchase 2 shares of the common from his father's estate, which together with the 4 shares already owned by him comprised the 6 shares here in controversy.[3] It was these 6 shares that Charles in 1948 placed in trust, naming himself, his attorney, and older son as trustees, and providing for distributions of income to his two sons. The trust had no other assets. Over the entire period from the creation of the trust in 1948 up to the date of Charles' death in 1967—and indeed up through 1970—the total amount of dividends received by the trust in respect of the 6 shares was only $300. In contrast, the company paid dividends in the amount of $1,129,900 with respect to the preferred up to the date of Charles' death.

Can there be any doubt that the only purpose of the 6 shares was to provide Charles with the sought-after control over the company? These shares were conceived and issued solely for that purpose. It was that control that was central to their very life.[4] Plainly, the continued existence of such control in Charles' hands for the remainder of his life constituted his "enjoyment" thereof within the meaning of section 2036(a)(1).

To be sure, as is indicated in *United States v. Byrum,* 408 U.S. 125, it is the income from property that is ordinarily regarded as the "enjoyment" contemplated by section 2036(a)(1). But that is not universally so, for, as recognized in *Byrum,* "enjoyment" in respect of real property may consist of its occupancy. See also

---

[2] See n. 1 *supra.*

[3] The remaining 4 shares owned by Isaac were distributed to his daughters, and were redeemed at a later time—in 1957—prior to Charles' death.

[4] The majority opinion concerns itself at some length with possible restraints that may have existed in respect of the control embodied in the 6 shares. Apart from the fact that as a practical matter such possible restraints were in general not very meaningful in the circumstances of this case, the critical consideration in this connection is that Charles bargained for such control (with whatever restraints may have been attached thereto) and it was the availability of that control (subject to such possible restraints) that may fairly be regarded as the "enjoyment" of which the statute speaks.

*Estate of Emil Linderme, Sr.,* 52 T.C. 305. Obviously, the nature and character of the property must be taken into account. In the case of a valuable oil painting, "enjoyment" may clearly be its availability for viewing on the transferor's walls. As to the 6 shares involved herein, the control which they embodied was their very raison d'être. It is that feature of those shares that must be predominantly associated with their "enjoyment," rather than their equity interest[5] in the corporation or their income-producing potential—features which were only of relatively minor consequence in the context of this case. As already noted, the total income received by the trust from these shares for a period of nearly 20 years was only the comparatively miniscule amount of $300. Had Charles reserved the right to that income, there could be no question that the value of the 6 shares would have been includable in his gross estate. How much more meaningful to him was the control that was concentrated in these shares! And how bizarre it is to attribute to Congress an intention that would require the inclusion of the 6 shares in the decedent's gross estate in the first situation but would call for their exclusion in the second! Clearly, when Congress used the word "enjoyment," it manifested a purpose to treat both situations alike.

The circumstances surrounding these 6 shares were so different from those involved in *Byrum,* that I cannot believe that *Byrum* is of controlling authority in support of the majority's position. Similarly, there is only a superficial similarity between this case and that line of cases,[6] relied upon by the petitioners, in which broad administrative and managerial powers reserved to the grantor of a trust have been held insufficient to bring section 2036(a)(1) or like provisions into play. It is clear to me that "enjoyment" of the 6 shares here in issue means the continued control embodied therein.

---

[5] The majority opinion refers to the Commissioner's determination that the 6 shares had a value of $24,500,000. But that valuation was obviously based primarily upon including the control feature as the principal component of value. Moreover, the question of value of these shares is vigorously contested by petitioners, and was severed for separate trial in the event that it should be held that the shares are includable in the gross estate. Without intending to prejudge their value, it does seem from the materials before the Court that the Commissioner's figure, as well as the deficiency itself, has been grossly overstated.

[6] See, e.g., *Old Colony Trust Co. v. United States,* 423 F. 2d 601 (1st Cir.); *United States v. Powell,* 307 F. 2d 821 (10th Cir.); *Estate of Edward E. Ford,* 53 T.C. 114, affirmed per curiam 450 F. 2d 878 (2d Cir.); *Estate of Ralph Budd,* 49 T.C. 468; *Estate of Marvin L. Pardee,* 49 T.C. 140; *Estate of James H. Graham,* 46 T.C. 415; *Estate of Willard V. King,* 37 T.C. 973.

I fully recognize that under the decided cases the mere continuance of "enjoyment" by the transferor until his death is not sufficient, and it is essential in addition that such enjoyment be "retained." However, it has also been established that such retention need not be based upon a legally enforceable right [7] and may be predicated upon an informal arrangement or even a mere tacit or implied understanding. *Estate of McCabe v. United States,* 475 F. 2d 1142, 1146 (Ct. Cl.); *McNichol's Estate v. Commissioner,* 265 F. 2d 667, 670-671 (3d Cir.), affirming 29 T.C. 1179, certiorari denied 361 U.S. 829; see also *Skinner's Estate v. United States,* 316 F. 2d 517 (3d Cir.), affirming 197 F. Supp. 726 (E.D. Pa.); *Estate of Harry H. Beckwith,* 55 T.C. 242, 247; cf. *Estate of Ethel R. Kerdolff,* 57 T.C. 643, 648; *Estate of Emil Linderme, Sr.,* 52 T.C. 305, 308.

Was there such an understanding here? In my judgment, unless one were to be hopelessly naive, the existence of such understanding must be inferred from this record. In the absence of any explanation to the contrary, it is clear beyond any reasonable doubt that Charles who had fought so hard to obtain the control inherent in the 6 shares would not have parted so readily with that control only a few years after he had attained his objective. Nor can it fairly be inferred that the establishment of the trust was intended in any manner to provide income of any consequence to Charles' two grownup sons. Plainly, the trust was merely a device through which Charles could continue to exercise control until his death, and which provided a mechanism for its exercise thereafter. To be sure, there were two other trustees, his attorney and older son, and the votes of two of the three were necessary in order to take effective action. The majority herein relies upon the testimony of the attorney which indicates that there was never any agreement, express or implied, between them in respect of the continuance of Charles' control. I heard that testimony—indeed I was the only member of this Court that did hear it—and it is my unpleasant duty to say that I did not find his testimony credible. I had ample opportunity to observe him, and I paid most careful attention to him and his words as he spoke. I had no confidence whatever in that testimony to the extent that

---

[7] The "enjoyment" clause of sec. 2036(a)(1) is thus to be sharply distinguished from 2036(a)(2) which was held in *Byrum* to turn upon a legally enforceable right, and which was the principal issue considered in *Byrum.* It is similarly to be distinguished from that portion of 2036(a)(1) relating to a retention of a "right" to income from the transferred property. No such limiting language is present in respect of the "enjoyment" clause.

it expressly denied, or merely suggested the absence of, an implied agreement or tacit understanding that Charles would continue to remain in control of the company's affairs. I have no doubt in the circumstances of this case that there was at least such a tacit understanding. I am unwilling to indulge in the child-like innocence that is necessary to reach the opposite conclusion; certainly, no such credulity is required of a trial judge.

SIMPSON and WILBUR, *JJ.,* agree with this dissent.

TANNENWALD, *J.,* dissenting: What bothers me most about the majority approach is that is appears to escalate the rationale of *United States v. Byrum,* 408 U.S. 125 (1972), which was developed in light of the particular facts of that case, into a mandated rigid doctrine of wide application. In other words, the majority opinion may be interpreted as concretizing *Byrum,* thus opening up the possibility that future decisions will permit trust arrangements to avoid estate tax consequences contrary to the clear intent of Congress as expressed in section 2036. If this is not the intended consequence of our decision herein—and I am confident that it is not—then the approach of the majority contains an even more difficult and dangerous element, namely, the substitution of the judgment of those who did not hear the evidence for that of the trier of the facts. Judge Raum conducted the trial and saw and heard the witnesses. He did not merely conclude that the petitioner had failed to carry its burden of proof. On the contrary, he reached the affirmative ultimate factual conclusion that there was an understanding between the settlor and the trustees which resulted in the settlor retaining "enjoyment of * * * the property" within the meaning of section 2036(a)(1). Under these circumstances, I do not believe that Judge Raum's evaluation of the testimony and the record as a whole should be disregarded, particularly where we are faced with such a unique situation, namely, that the trusteed shares were so structured that, given the pliability of the other trustees and the holders of the other classes of stock, those shares had no meaningful attributes apart from the right to vote and thus control the destiny of the corporation. In my opinion, this case is

sui generis and situations where the trusteed shares of a closely held corporation have a relatively [1] significant actual or potential value apart from the right to vote are to be clearly distinguished, thereby avoiding, in very large degree, the implications of applying the Government's position in *Byrum* which so obviously troubled the majority of the Supreme Court in that case. See 408 U.S. at 146-150, and particularly n. 34.[2]

WILBUR, *J.,* agrees with this dissent.

---

[1] I note that, in relative terms, the bulk of the participation of the common stock, upon liquidation of the corporation, was on a share-for-share basis with the preferred stock. The ratio was 10/9,911 at the time the trust was established and 6/5,268 at the time of the settlor's death.

[2] Compare *Estate of Hilton W. Goodwyn,* T.C. Memo. 1973-153; *Estate of Arthur A. Chalmers,* T.C. Memo. 1972-158.